**PIONEER CHLOR ALKALI COMPANY, INC., Appellant,**

v.

**ROYAL INDEMNITY COMPANY, Appellee.**

No. A14–93–00391–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 31, 1994.

William W. Rucker, Jr., Gregg C. Laswell, William T. Miller, Houston, for appellant.

David J. Plavnicky, Houston, for appellee.

Before MURPHY, ELLIS and JUNELL (Sitting by Designation), JJ.

## OPINION

ELLIS, Justice.

This is an appeal from a summary judgment granted in favor of Royal Indemnity Company (Royal), appellee, ordering that Pioneer Chlor Alkali Company, Inc. (Pioneer), appellant take nothing judgment from Royal. The primary dispute in the case concerns the interpretation of an insurance policy issued by Royal to Pioneer. Pioneer brings five points of error challenging the summary judgment. We affirm in part, reverse and render in part, and reverse and remand in part.

Pioneer produces chlorine, caustic soda, and muriatic acid at its plant in Henderson, Nevada. Pioneer purchased several insurance policies, including a Boiler and Machinery policy (the Policy) from Royal, to protect itself against accidents resulting from operations at the plant. The Policy was issued by Royal to Pioneer to cover certain damages to property which might occur during the period beginning October 25, 1988, to October 25, 1991. The Policy also included business interruption coverages but only in the event covered property damage occurred.

On May 6, 1991, an incident occurred at the plant which resulted in the release of approximately forty-two (42) tons of chlorine into the surrounding atmosphere. As a result, Pioneer suffered damage to equipment at the plant and suffered a business interrup-

tion. Pioneer sought coverage from Royal under the Policy.

## THE INCIDENT

The incident that is the basis of this suit occurred in the chlorine production facilities of the plant. A general understanding of the manner in which chlorine is prepared for sale is necessary in order to appreciate the nature of Pioneer's claims under the Policy issued by Royal.

Chlorine is initially produced in a gaseous form, is liquified, and then stored in tanks to await shipment to customers. In the liquification process, the chlorine gas is piped through a secondary chlorine liquefier (the liquefier). Specifically, the chlorine is piped through seven hundred and eighty (780) small tubes in the liquefier. Cold saltwater, known as brine, is circulated around the tubes in the liquefier to cool and liquify the chlorine gas flowing through the tubes.

At some time prior to May 6, 1991, a cloth rag somehow got into the liquefier and became lodged in the area between the tubes and the outer shell of the liquefier, i.e., the area through which the brine is circulated. It is unclear how the rag got into the liquefier or how long it had been there; however, it seems clear that the rag must have been in the liquefier for a period of years. The rag was lodged in the area where the brine enters the liquefier and caused the flow of brine to be diverted from its usual course, accelerated through a few very localized passages, and concentrated directly on a few of the tubes. The concentrated flow generated an "erosion/corrosion" mechanism that caused four holes in three of the tubes. When the tubes were breached, the brine circulating outside the tubes entered the tubes and mixed with the chlorine. This mixing created an extremely acidic solution which then travelled downstream through the piping from the liquefier to the chlorine storage

tanks. This caused considerable damage to the property and equipment downstream from the liquefier. The solution also caused a hole in an elbow of the downstream piping resulting in the release of forty-two (42) tons of chlorine into the atmosphere.

## THE POLICY

The Policy, known as a Boiler and Machinery policy, provides in the coverage clause that Royal will pay "for direct damage to Covered Property caused by a Covered Cause of Loss." "Covered Property" means any property owned by Pioneer or which is in the care, custody, or control of Pioneer and for which Pioneer is legally liable. There is no dispute that the property that was damaged was "covered property." A "Covered Cause of Loss" is defined by the Policy as an "accident to an object."[1] Thus, the Policy provides coverage to Pioneer for direct damage to any property owned or controlled by Pioneer caused by an accident to an object. The Policy, pursuant to Endorsement seven, also covers Pioneer's actual loss and extra expense, as those terms are defined in the endorsement, from an interruption in its business "that is caused solely by an accident to an object."

"Accident" is defined by the Policy as:

... a sudden and accidental breakdown of the "object" or a part of the "object." At the time the breakdown occurs, it must manifest itself by physical damage to the "object" that necessitates repair or replacement.

None of the following is an "accident":

a. Depletion, deterioration, corrosion or erosion;

b. Wear and tear;

c. Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

d. Breakdown of any vacuum tube, gas tube or brush;

---

1. An "object" means the equipment shown in the Declarations in the Policy. It is unnecessary to the disposition of this appeal to list all of the items enumerated in the as "objects" in the Poli-

cy. The parties do not dispute that the property and equipment damaged are "Covered Property" or were that they are "objects" within the meaning of the Policy.

e. Breakdown of any electronic computer or electronic data processing equipment;

f. Breakdown of any structure or foundation supporting the "object" or any of its parts;

g. The functioning of any safety or protective device.

Thus, based on the coverage language and definitions described above, coverage can only exist under the Policy if there is direct damage to Pioneer's property (or a loss from an interruption in business) that is caused by a sudden and accidental breakdown of an object that manifests itself by physical damages that necessitates repair or replacement; however, certain events are excluded from consideration as accidents. Specifically, corrosion and erosion are not accidents under the Policy.

## THE DISPUTE

On the day of the incident, Pioneer contacted Royal and requested that Royal send a representative to the plant to investigate. Royal sent a representative, Philip Schaefer, to the plant on May 13, 1991. In the meantime, Pioneer hired Failure Analysis Associates, Inc. (Failure Analysis) and Rimkus Consulting Group, Inc. (Rimkus), engineering firms, to determine the cause of the accident and to insure that there would not be any further chlorine releases into the atmosphere. Pioneer claims that once Schaefer arrived, he did not perform an actual investigation; rather, he "piggy-backed" on the investigation conducted by the firms hired by Pioneer. Royal claims that Schaefer did investigate by observing the work performed by Failure Analysis and Rimkus, testing tanks and vessels at the plant, and by writing three reports summarizing his observations and findings. Royal also hired Packer Engineering, Inc. (Packer) to analyze the data produced by Pioneer's investigators. Royal sent Schaefer to the laboratory of Failure Analysis to attend some of the tests performed on the liquefier, tubes, and piping. Royal also sent engineers from Packer to the plant to observe the examination of the rag

found in the liquefier. By letter of June 20, 1991, Royal requested that Pioneer provide Royal with data developed or obtained by Failure Analysis or Rimkus. Pioneer claims that it complied with this request. Royal admits that the information was eventually forwarded, but that it was not sent until September. Pioneer also allowed Packer to review subsequent tests, presentations, and reports generated by Failure Analysis

By letter dated March 5, 1992, Royal denied coverage. In the letter, William Shenberger, a claims adjuster for Royal, stated that following an investigation and evaluation of the circumstances surrounding the May 6, 1991, incident, Royal had determined that the incident was not an "accident" as that term was defined by the Policy, but instead was the result of significant corrosion which had built up over time. Since corrosion was not an "accident," Pioneer's damages were not covered. The letter also stated that because of the extended time period during which the damage to the liquefier and chlorine lines developed, the incident was not a "sudden and accidental breakdown of an object." Therefore, Royal felt that Pioneer's damages were not caused by a "Covered Cause of Loss" and not recoverable under the Policy.

Thus, Royal gave two reasons for its denial of coverage: (1) the incident was not an "accident" because it was the result of corrosion, and corrosion is excluded as an "accident" under the terms of the Policy; and (2) the rag and the erosive/corrosive mechanism created by the rag which led to the holes built up over time so the incident was not a "sudden and accidental breakdown of an object."

Pioneer asserts that the incident is covered by the Policy because although erosion or corrosions itself cannot be an accident under the Policy, an accident which **results from** erosion or corrosions is a risk covered by the Policy. Pioneer contends that while the Policy definition of "accident" excludes corrosion, it does not exclude a sudden and accidental breakdown which might have been caused by corrosion.

Royal disagrees with Pioneer's interpretation of the Policy. Royal argues that Pioneer's argument is flawed because it ignores the causation element set out in coverage clause: Royal will only pay for direct damage **caused by** a "Covered Cause of Loss," i.e. an "accident." Thus, Royal claims that since the direct damage was caused by corrosion, not an accident, its denial of coverage was rightful.

## THE TRIAL COURT'S RULINGS

Pioneer filed suit against Royal seeking a declaratory judgment declaring that under the terms of the Policy it is entitled to damages from Royal for the amount of the loss in excess of the deductible, claiming breach of contract, breach of the duty of good faith and fair dealing, breach of the duty to investigate the accident, and also made various claims under the Texas Insurance Code, the Texas Administrative Code and Texas Deceptive Trade Practices Act. Pioneer and Royal each filed motions for partial summary judgment concerning the issue of contractual liability under the Policy. Pioneer argued that the Policy language was unambiguous, and that the Policy provided coverage for the May 6th incident as a matter of law. Alternatively, Pioneer argued that even if the Policy was ambiguous, its construction was reasonable under Texas law concerning interpretation of insurance policies, and it was entitled to judgment as a matter of law. Conversely, Royal argued that the Policy was unambiguous, but that it did not provide coverage for the incident as a matter of law. The trial court granted Royal's motion and denied Pioneer's.

Royal also filed motions for partial summary judgment as to Pioneer's claim that it breached its duty of good faith and fair dealing and its duty to investigate. These motions were also granted by the trial court. The trial court concluded that Pioneer's claims under the Texas Insurance Code, the Texas Administrative Code, and the Texas Deceptive Trade Practices Act were rendered moot by virtue of its summary judgments on the issues of contractual liability, breach of the duty of good faith and fair dealing, and failure to investigate. As a result, the trial court dismissed these claims.

## THE APPEAL

Following the trial court's rulings, Pioneer perfected this appeal. Pioneer brings five points of error: the trial court erred in granting Royal's motion for partial summary judgment as to contractual liability and finding that Royal has no liability to Pioneer under the Policy as a matter of law; the trial court erred in denying Pioneer's motion for partial summary judgment as to contractual liability; the trial court erred in granting Royal's motion for partial summary judgment on Pioneer's claim that Royal breached its duty of good faith and fair dealing and determining that Royal had a reasonable basis, as a matter of law, for denying Pioneer's claims under the Policy; the trial court erred in granting Royal's motion for partial summary judgment claiming that Pioneer failed to state a cause of action against Royal for breach of the duty to investigate; and the trial court erred in dismissing all of Pioneer's claims asserted against Royal under the Texas Insurance Code, the Texas Administrative Code, and the Texas Deceptive Trade Practices Act.

## THE STANDARD OF REVIEW

A summary judgment is not entitled to the same deference given a judgment following a trial on the merits. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984). When reviewing the granting of a motion for summary judgment, an appellate court does not view the proof in the light most favorable to the trial court's judgment; rather, it must indulge every reasonable inference in favor of the non-movant. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). The issue is not whether the non-movant raised a material fact issue precluding summary judgment, but whether the movant has proved entitlement to judgment as a matter of law. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828–

29 (Tex.1970); *see* TEX.R.CIV.P. 166a(c). If the movant fails to meet its burden, the appellate court must reverse and remand the case for further proceedings. *Gibbs,* 450 S.W.2d at 828–29. However, where both parties file a motion for summary judgment and one is granted and one is denied, the denial may be considered by the reviewing court if the appealing party complains of both the granting of the opponent's motion and the denial of his own motion. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). In that instance, the appellate court should determine all questions presented, and may reverse the trial court's judgment and render the judgment the trial court should have rendered, including rendering judgment for the other movant. *Id.*

■ The appropriate standard of review for summary judgment has been clearly set forth by the Texas Supreme Court:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubt resolved in its favor.

*Nixon,* 690 S.W.2d at 548–49; *Montgomery,* 669 S.W.2d at 310–11.

## CONTRACTUAL LIABILITY

In points of error one and two, Pioneer complains that the trial court erred in granting Royal's motion for partial summary judgment and denying its motion for partial summary judgment on the issue of contractual liability. We agree.

Royal argues, and the trial court agreed, that the May 6th incident was not covered under the Policy because it was not an "accident." Specifically, Royal claims that the incident was not an accident because the incident "was *the result of* significant corrosion which had built up over a considerable period of time." [emphasis in the original] Royal contends that because corrosion is excluded from being an "accident" under the terms of the policy, coverage was properly denied. Royal also argues that it properly denied Pioneer's claim because the damage to the liquefier tubes built up over time, "the incident was not sudden and accidental breakdown of an object" and therefore, it was not covered by the Policy.

Pioneer does not dispute Royal's claim that corrosion is not an "accident" under the terms of the policy, nor does it dispute the fact that the incident was caused by corrosion; however, Pioneer argues that since the Policy defines "accident" only by stating that corrosion itself is not an accident, a sudden and accidental breakdown that *results from or is caused by corrosion* is a risk that is covered by the Policy. Pioneer agrees that the Policy does not cover the costs for replacing the chlorine tubes which eroded or corroded; however, if that erosion or corrosion in turn causes an accident that damages covered property, those damages are covered.

Royal counters that Pioneer's interpretation is incorrect because it ignores the causation language contained in the coverage clause. In that coverage portion of the Policy, it states that Royal will pay for direct damage to "Covered Property" *caused by* a "Covered Cause of Loss." Royal argues that this causation language means that either corrosion or an accident caused by corrosion is excluded from coverage.

Although there are no Texas cases interpreting the policy language at issue here, we can look to the Texas rules concerning construction of insurance policies to interpret it, and look to other states that have considered this language for guidance.

■ Insurance policies are contracts and as such are controlled by the rules of construction applicable to contracts generally. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987); *Bonner v.*

*USAA*, 841 S.W.2d 504, 506 (Tex.App.—Houston [14th Dist.] 1992, writ denied). If the policy is worded so that it can be given only one reasonable construction, it will be enforced as written. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984); *Bonner*, 841 S.W.2d at 506. A policy is ambiguous only when there is a "genuine uncertainty as to which one of two or more meanings is proper." *State Farm Lloyds, Inc. v. Williams*, 791 S.W.2d 542, 545 (Tex. App.—Dallas 1990, writ denied). Whether the policy is ambiguous is a question of law for the court. *Id.*

▉ Generally, in the insurance context, the language and terms of the policy are chosen by the insurance company. *See Barnett*, 723 S.W.2d at 665. Therefore, if the language chosen is ambiguous or inconsistent, and susceptible of more than one reasonable interpretation, the court must resolve the uncertainty by adopting the construction that most favors the insured. *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991); *Bonner*, 841 S.W.2d at 506. The policy should be construed strictly against the insurer and liberally in favor of coverage for the insured. *Barnett*, 723 S.W.2d at 666. The court must adopt the construction of an exclusionary clause urged by the insured so long as that construction is not unreasonable, even if the construction urged by the insurer is more reasonable. *Hudson*, 811 S.W.2d at 555; *Continental Casualty Co. v. Warren*, 152 Tex. 164, 254 S.W.2d 762, 763 (1953). Specifically, exceptions or limitations on liability are strictly construed against the insurer. *Id.*; *Bonner*, 841 S.W.2d at 506. Thus, once the insured presents a reasonable construction of the terms of the policy at issue, any ambiguity must be resolved, as a matter of law, against the insurer and in favor of coverage. *See Balderama v. Western Casualty Life Ins. Co.*, 825 S.W.2d 432, 434 (Tex.1991).

We agree with Pioneer that *Bonner* provides the correct guidance for our analysis in this case. In *Bonner*, the issue concerned the interpretation of language in a homeowner's insurance policy. 841 S.W.2d at 505. The construction of the policy language at issue had not previously been interpreted by any Texas court. *Id.* at 506. In our analysis, we looked to decisions from other states wherein the courts had interpreted the exclusionary language before us. *Id.* at 507. Those cases reached differing results: some construed the language in favor of the insured, some found in favor of the insurer. *Id.* We therefore concluded that the policy language at issue was "susceptible of two reasonable constructions." *Id.* In light of that holding, we were compelled by *Hudson* to construe the exclusionary clause in the homeowner's policy in favor of the insured and against the insurance company. *Id.*

Here, Pioneer cites four cases in support of its interpretation of the Policy. Pioneer first cites *Lakeshore Marine, Inc. v. Hartford Accident and Indemnity Co.*, 164 Ga. App. 417, 296 S.E.2d 418 (1982). In that case, Lakeshore Marine, Inc. (Lakeshore) sought to recover damages under a boiler and machinery policy issued by Hartford Accident and Indemnity Company (Hartford) following an incident involving the discharge of chlorine gas from a storage tank. *Id.* at 419, 296 S.E.2d 418. The trial court granted summary judgment in favor of Hartford. *Id.* The Georgia Court of Appeals reversed the trial court's judgment and ordered that summary judgment be entered in favor of Lakeshore on the issue of contractual liability. *Id.* at 422–23, 296 S.E.2d 418.

Lakeshore had two chlorine tanks attached to a "V–100" chlorinator system on its premises to chlorinate the water in its restaurant. *Id.* at 420, 296 S.E.2d 418. Both tanks were filled with chlorine gas under pressure. *Id.* The chlorine in one of the tanks began escaping, spewing chlorine gas into the air. *Id.* A physicist at the Georgia Institute of Technology determined the escape was initiated by the breakdown of a check valve "O" ring in an injector. *Id.* The check valve was to prevent water from backflowing into the system when the water flow through the injector had been cut off. *Id.* Fragments from the "O" ring eventually caused a second check

valve, the one in the control unit, to remain open. *Id.* This permitted water to pass through the entire system down into the chlorine tank. *Id.* Once the water mixed with the chlorine, a highly corrosive liquid was created within the chlorine tank. *Id.* As the tank corroded, it caused a sudden expulsion of the valve seat and this resulted in the expulsion of the chlorine into the air causing damage to Lakeshore's property. *Id.*

The insuring or coverage clause in the policy provided coverage "... respecting loss from an Accident, as defined herein, occurring while this endorsement is in effect, to an Object, as defined herein, while the Object is in use or connected ready for use at any Location specified in the declarations." *Id.* at 421, 296 S.E.2d 418. The policy defined "Accident" as: "a sudden and accidental breakdown of the Object, or a part thereof, which manifest itself at the time of its occurrence by physical damage to the Object that necessitates repairs or replacement of the Object or part thereof, but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material ..." *Id.* Hartford argued that the escape of the chlorine gas was not an "Accident" under the terms of the policy, in part, because the incident was the result of corrosion which caused the gradual decay of valve components in the chlorinator system. *Id.* Hartford reasoned that since corrosion is excluded from being an accident, coverage was properly denied. *See id.* Lakeshore countered this argument contending that while corrosion itself is not covered by the terms of the policy, an "Accident" caused by corrosion was not excluded. *Id.* at 422, 296 S.E.2d 418.

The Georgia appellate court agreed with Lakeshore. After deciding that the policy language was susceptible to more than one reasonable interpretation and applying the rule of construction that in such an instance the interpretation most favorable to the insured *must* be adopted,[2] it held as follows:

2. Georgia follows the same rules of construction concerning the interpretation of insurance policies as Texas does. *See Lakeshore Marine, Inc. v.*

While the language of the policy clearly precludes corrosion itself from being an "Accident," there is no express language excluding a sudden and accidental breakdown of an "object *resulting from* (at least in part) corrosion.

*Id.* [emphasis in the original] The court went on to state that if Hartford had intended to exclude from coverage a sudden and accidental breakdown of an "Object" **resulting from or caused by** corrosion, it could have undoubtedly used more apt and definitive language. *Id.* [emphasis added] The court reversed the trial court's summary judgment in favor of Hartford and ordered that summary judgment be entered for Lakeshore. *Id.* at 422–23, 296 S.E.2d 418.

Royal argues that *Lakeshore* is distinguishable because: (1) the policy at issue in *Lakeshore* does not contain the precise language as Pioneer's policy, specifically, there is no causation language in the insuring clause; and (2) the facts of the *Lakeshore* case are dissimilar.

Royal contends that since there was no causation language in the Lakeshore policy, the only question before the Georgia court was whether there had been an accident. However, in Pioneer's policy, the insuring clause contains two elements that speak to causation: "caused by" and "a Covered Cause of Loss." Thus, Royal argues, *Lakeshore* is distinguishable and does not support Pioneer's position. We disagree. While the insuring clause in *Lakeshore* does not contain the precise language used in Pioneer's policy, it does contain causation language. Lakeshore's policy provided coverage "respecting loss **from** an accident." [emphasis added]. It defines "from" by specifically referencing the word "cause." Webster's states that "from" is "used as a function word to indicate the source, **cause,** agent or basis." Webster's New Collegiate Dictionary 461 (1977). Thus, Royal's argument that "from" is not causation language and is significantly

*Hartford Accident and Indemnity Co.,* 164 Ga. App. 417, 296 S.E.2d 418, 421–22 (1982).

different from "caused by" is without merit. Royal would have us believe that trying to use "from" in place of "caused by" is like mixing apples and oranges; rather, if we accept Royal's argument, we would be mixing apples with apples. This is apparent when we insert "from" into Pioneer's insuring clause in place of "caused by,": "We will pay for direct damage to Covered Property [from] a Covered Cause of Loss." Whether the word "from" is used or the phrases "caused by" or "resulting from," the meaning does not change.

Royal also argues that *Lakeshore* does not support Pioneer's position because it is factually distinguishable. This argument is also without merit. In *Lakeshore*, water mixed with chlorine creating an acidic mixture. When a valve failed, this corrosive mixture was released and caused damage to Lakeshore's property. The damage was corrosion damage. There is no difference in this case. When the brine entered the chlorine tubes, an acidic mixture was created. This mixture was released, causing extensive damage to Pioneer's property. The cases are not factually distinguishable.

In *Riefflin v. Hartford Steam Boiler Inspection and Ins. Co.*, 164 Mont. 287, 521 P.2d 675 (1975), also cited by Pioneer, the Montana Supreme Court held that "scale build-up" in a boiler was not covered by a boiler and machinery policy, but that the cracking of the boiler sections was, even though it was caused by the scaling. 521 P.2d at 678.

The policy at issue in *Riefflin* defined "accident" as:

... a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of its occurrence by physical damage to the Object that necessitates repair or replacement of the Object or a part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material.

*Id.* at 677.

In *Riefflin*, a couple who owned the Missoula Motel found that the cast iron boiler that provided heat for the hotel was cracked at one end. *Id.* at 676. Hartford performed an inspection and paid a claim in the amount of $440.43 for replacement of the cracked section. *Id.* The investigation performed by Hartford revealed that excessive scale build-up in the boiler had caused the crack, and that in view of the amount of scale found, it was likely that the remaining sections in the boiler would subsequently crack in a fashion similar to that of the damaged section. *Id.* Based on Hartford's recommendation, the Riefflins had the boiler chemically cleaned at their own expense. *Id.* Approximately a year and a half later, another section in the boiler cracked and Hartford acknowledged liability and paid the Riefflins $818.49 for replacement of the cracked section. *Id.* at 676–77. While the boiler was dismantled for repair, a third cracked section was discovered. *Id.* at 677. In light of all of this, Hartford recommended that the boiler be replaced, and the entire heating system checked for leaks. *Id.*

While awaiting the arrival of the new boiler, the Riefflins continued to use the old one. *Id.* During this period, additional sections of the old boiler cracked. *Id.* The Riefflins sued Hartford seeking the cost of cleaning the boiler, the cost of replacing the old boiler, and the cost of replacing the second cracked section. *Id.* Hartford only offered to pay the cost of replacing the second cracked section and the third cracked section. *Id.*

The trial court found that the build-up of scale was not "sudden and accidental" and was therefore, not an accident. *Id.* at 678. Consequently, the trial court ruled there was no coverage for the clean-up expenses or the replacement of the boiler. *Id.* The Montana Supreme Court agreed with these rulings and held that Hartford did not have to pay these costs. On the other hand, the court held that the cracking of the boiler sections, which were **caused by** scale build-up, was an accident covered by the policy. *Id.* Even Hartford acknowledged its liability for the cracked sections caused by the build-up. *Id.* Therefore, although scaling itself was not an accident, a breakdown caused by scaling was an accident. *See id.*

Royal argues that *Riefflin* does not support Pioneer's position because the insuring language from the policy was not set out in the opinion or discussed by the Montana Supreme Court. Royal contends that since the court only considered the definition of "accident" without looking at the insuring clause, it is only conjecture on the part of Pioneer that *Riefflin* supports its claim. An analytical review of the Montana court's opinion dispels this contention. The court ruled that the cost to repair the cracks in the boiler was covered even though they were caused by scaling because the cracks were accidents. *Id.* However, costs to clean up scale that did not cause cracks and the cost of the new boiler were not covered because scaling itself was not an accident. *Id.* Therefore, the insuring clause in the policy undoubtedly stated that it would only cover damages caused by, as a result of, or from accidents. The issue before the court was whether the incidents in question were "accidents" under the terms of the policy. Once the court determined whether the incidents were "accidents," there was no dispute that the damages resulting from the accidents were covered. This is the same issue before this court: whether the release of chlorine gas into the atmosphere was an accident.

■ Royal would have us put the proverbial cart before the horse in analyzing the insurance provisions. Royal argues that we should first look to the insuring clause to determine whether there is coverage. This is illogical. Under the terms of the policy, Royal will pay Pioneer for direct damage to covered property caused by a covered cause of loss. There is no dispute that there was direct damage to covered property. The only question is whether the damage was caused by a covered cause of loss. A covered cause of loss is an accident. Thus, we must first determine whether there was an accident before we can determine whether the damage was caused by that accident. It would be improper to bring down the causation language and read it into the definition of accident. If Royal had desired to put causation language in the definition of acci-

dent it could have done so. Thus, whether the Montana court discussed the insuring clause and its specific language is immaterial.

In *Cyclops Corp. v. Home Ins. Co.*, 352 F.Supp. 931, 937 (W.D.Pa.1973), the court held that Cyclops Corporation (Cyclops) was entitled, under its boiler and machinery policy, to recover for a business interruption loss caused by damage to an electric motor. The insuring clause in the Cyclops policy obligated Home Insurance Company (Home Insurance):

> To pay the insured the amount of Actual Loss Sustained which results from a total or partial prevention of Business ... provided the prevention of Business is caused solely by an Accident, which occurs while this endorsement is in effect, to an object designated and described in any Schedule specified ...

*Id.* at 932.

The policy defined "accident" as:

> ... the sudden and accidental damage to an object or part thereof which necessitates repair or replacement to the object or part thereof, but "accident shall not mean:
>
> A. Depletion, deterioration, corrosion or erosion of material;
>
> B. Wear and tear; ...

*Id.* at 932–33.

The machine involved in the case was an 8,500 horse power electric motor forming part of the steel-making facilities of Cyclops. *Id.* at 933. On its start-up, the motor went into severe vibrations which necessitated a shut-down. *Id.* The machine was inspected and repaired and returned to the Cyclops plant nine days after it malfunctioned. *Id.* This nine day business interruption formed the basis of the claim made by Cyclops to Home Insurance. *Id.* The expert engineer for Home Insurance found that the cause of the malfunction was that the initial fit of the shaft to part of the motor was inadequate and that this defect existed from the time of manufacture. *Id.* at 934. The engineer also

concluded that the failure was not caused by control or operation of the motor by Cyclops. *Id.*

The federal district court stated that the question of whether these two facts created a material fact issue precluding summary judgment rested upon whether the definition of "accident" required a consideration of causation. *Id.* In other words, the court stated, "[I]s it necessary to a determination of the meaning of 'sudden and accidental damage' that we know the cause thereof?" *Id.*

Home Insurance's expert opined that the incident with the motor was caused by the improper fit of the motor on the shaft and that the progressive wear and tear between the shaft and the part connecting it to the motor gradually increased the vibrations until the time of the shut-down. *Id.* The policy excluded "wear and tear" from the definition of "accident," therefore, since wear and tear **caused** the shut-down of the Cyclops plant, Home Insurance argued that it properly denied coverage. *See id.* Cyclops argued that the cause of the shut-down was immaterial; all that was required was sudden and accidental damage that required repair or replacement, i.e. an "accident." *See id.* at 936.

After explicitly stating that it had examined **all** of the policy provisions, the court held that the definition of "accident" did not require any consideration of the term "cause." *Id.* [emphasis added] The court stated that "accident" only required "sudden and accidental damage" which "necessitates repair." *Id.* The policy language did not limit coverage to damage by accidental means; it spoke of "sudden and accidental damage to an object" regardless of the means by which that came about. *Id.* at 937. The court, therefore, granted Cyclops' motion for summary judgment on the issue of coverage, i.e., contractual liability. *Id.*

Royal again argues that the case is inapplicable because the court failed to consider the language in the insuring clause. Royal contends the court's reasoning is flawed and the opinion is of no relevance. Again, Royal is incorrect. In this instance, however, it is not merely Royal's interpretation of *Cyclops* that is an issue, Royal has failed to read the case closely.

In Cyclops, the very first thing quoted by the court from the insurance policy is the insuring clause. *Id.* at 932. Then, the court looks at the definition of "accident" in light of the question of whether causation should be considered. Clearly, the court considered the causation language in the insuring clause. More importantly however, before the court holds in favor of coverage it specifically states: "Again we must examine all of the policy provisions." *Id.* at 936. The court did not limit itself to the consideration of the term "accident," but weighed all of the policy provisions. Thus, the *Cyclops* case, whose language in the insuring clause and in the definition of "accident" is almost indistinguishable from that in the case before us, wholly supports the position asserted by Pioneer. The entire analysis undertaken by the court in *Cyclops* focused on whether causation was a proper inquiry in determining whether there had been an accident when the only causation language in the policy appeared in the insuring clause and not in the definition of accident.

Lastly, Pioneer cites *Central Louisiana Elec. Co. v. Westinghouse Elec. Co.,* 579 So.2d 981 (La.1991), in support of its interpretation of the policy. In *Central Louisiana,* the issue before the Louisiana Supreme Court was whether a boiler and machinery policy which provided coverage for damage to property caused by an accident, but which specifically excluded corrosion from the definition of accident, covered the cost of replacing an entire blade unit due to the presence of corrosive pitting and resultant cracks. 579 So.2d at 982.

In June of 1982, an alarm sounded at the Central Louisiana Electric Company (CLECO) generating station indicating the turbine generator unit had sustained high vibrations. *Id.* at 983. The unit was shut down, and a preliminary investigation revealed that an "L–1 shroud," a blade, in the turbine had

broken loose and damaged the other blades in the turbine. *Id.* After a more detailed investigation was conducted by Westinghouse, it was determined that the "L–1" blades were damaged by "corrosion pitting" peculiar to the "L–1" blades. *Id.* CLECO decided, based on Westinghouse's investigation, to replace all the "L–1" blades with a different type of blade at a cost of over $800,000.00 in order to prevent future damage. *Id.* at 983–84. CLECO sought payment for the replacement of these blades under the boiler and machinery policy issued to it by several underwriters. *Id.* at 984. Coverage was denied because the policy excluded corrosion damage from the definition of "Accident." *Id.* CLECO brought suit against its underwriters claiming the blades were covered under the policy. *Id.*

The insuring clause in the CLECO policy stated:

> The Company hereby agrees with the named insured, respecting loss from an Accident as defined herein ... [T]o pay the Insured for loss or damage to property of the Insured directly caused by such accident to an Object, including loss or damage to property of the Insured consisting of accounts, ... or securities directly caused by such Accident to an Object.

*Id.*

The policy defined "Accident" as follows:

> "Accident" shall mean any sudden and accidental occurrence to the Object, or part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not means (a) depletion, deterioration, corrosion, or erosion of materials, (b) wear and tear, ...

*Id.*

The court stated that the crucial issue was whether this language covered the replacement of all the "L–1" blades in the turbine. *Id.* at 985. CLECO admitted that the cost of replacing the corroded blades was not covered under the policy; however, it argued that the resulting cracks and damages

caused by corrosion were covered. *Id.* The court found no merit in CLECO's position, and ruled in favor of the underwriters. *Id.*

The court stated that coverage depended on whether the damaged condition of the "L–1" blades was "directly caused" by an accident. *Id.* The court stated that the record showed that the damage to the blades was "corrosion assisted cracking" or "corrosion pitting." *Id.* These conditions develop slowly and are simply forms of corrosion. *Id.* Therefore, the court held, the underwriters' denial of coverage was proper. *Id.* at 987. In finding for the underwriters, however, the court made the same distinction that Pioneer makes here. If the loss complained of was corrosion, like the "L–1" blades, the policy would not provide coverage because "corrosion is not included within the definition of accident." *Id.* But, if corrosions is a "direct cause of a sudden and accidental occurrence which in turn directly causes damage ... the damage is covered because the proximate cause of the damage is a risk covered by the policy." *Id.* In a footnote, the court applied this construction to the facts before it and noted that although the specific blade that fractured in June of 1982 would not be covered because the cause of its damage was corrosion, any downstream damage caused by the blade would be covered because that damage would be directly caused by an accident rather than corrosion. *Id.* at 987, n. 15.

■ This analysis goes directly to the heart of Pioneer's argument. Pioneer admits that the tubes damaged because of the direct stream of brine concentrated onto the tubes would not be covered because that damage is corrosion damage; however, the damage caused by the sudden and accidental release of forty-two tons of chlorine would be. In *Central Louisiana,* there was never any sudden and accidental occurrence that caused damage, i.e. an accident, but in the case before us, Pioneer suffered damage because of a sudden and accidental release of chlorine gas into the atmosphere.

Royal wishes us to interpret this case to mean that any damage that is corrosive in

nature is not covered by its policy. We do not believe that is what the Louisiana Supreme Court meant; however, even if Royal is correct, and we have misinterpreted the decision in *Central Louisiana*, it is irrelevant. There are other cases supporting Pioneer's interpretation. *See Cyclops*, 352 F.Supp. at 931; *Lakeshore*, 296 S.E.2d at 418; *Riefflin*, 521 P.2d at 675. So, even if we were to hold that *Central Louisiana* does not support Pioneer, and in fact supports Royal, it would mean only that the policy language in question is susceptible of more than one reasonable interpretation because courts have interpreted similar provisions in different fashions. *See Bonner*, 841 S.W.2d at 507. In that situation, we would still conclude that summary judgment for Royal was improper because exclusions must be construed in favor of the insured if the interpretation propounded by the insured is not unreasonable and the policy language in question is susceptible to more than one reasonable interpretation. *See Hudson*, 811 S.W.2d at 555; *Bonner*, 841 S.W.2d 506.

In this vein, Royal argues that not every difference in the interpretation of an insurance policy amounts to an ambiguity, and therefore, just because Royal and Pioneer disagree on the proper interpretation of the policy does not mean that it is ambiguous and should be construed in Pioneer's favor. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–135 (Tex.1994). We recognize that just because two parties disagree over the proper construction of a contract or an insurance policy it does not mean that the contract or policy is ambiguous as a matter of course. However, when courts from several jurisdictions interpret similar policy provisions and reach different results, we have more than just a dispute between the insured and the insurer. Further, we have looked at this policy in its entirety without isolating or giving priority to any one phrase, sentence, or section, *see id.*, 876 S.W.2d at 134, and find that the policy provisions in question are susceptible to more than one reasonable interpretation. We find that Pioneer's interpretation is more reasonable than that urged by Royal; however, even it that were not the case, Pioneer's construction is not unreasonable, therefore, under *Hudson*, we must construe the policy in favor of Pioneer and coverage. Thus, while there is an ambiguity, i.e., more that one reasonable interpretation of the policy, there is no fact issue because the rules of construction require that such ambiguities be resolved in favor of the insured.

In support of its construction of the Policy, Royal cites *Bettigole v. American Employers Ins. Co.*, 30 Mass.App.Ct. 272, 567 N.E.2d 1259 (1991), wherein the court ruled that damage caused by corrosion was not covered under the insurance policy in question. The policy in *Bettigole* was a "Special Multi–Peril Policy" or an "all-risk" insurance policy. 567 N.E.2d at 1260. Bettigole sought to recover under the policy for corrosion damage to a concrete parking deck. *Id.* The policy stated it insured against risks of direct physical loss unless the loss was excluded in paragraph seven of the policy. The exclusion stated, in pertinent part: "This policy does not insure under this form against loss **caused by ... rust or corrosion.**" *Id.* Therefore, when the court ruled that the damage caused by corrosion was not covered, it was applying the specific language set out in the exclusion itself. Further, the main issue in the case was not the causation element, because the policy specifically provided for it in the exclusion; rather, the debate was over whether the term "corrosion" meant only natural corrosion or corrosion caused by something. *Id.* at 1261. The case before us is distinguishable because: (1) there is no causation language set out in the exclusion under the definition of "accident" in Pioneer's policy; (2) the issue in *Bettigole* concerned the definition of corrosion, not an interpretation of the insuring clause and the definition of "accident;" and (3) the case does not involve a boiler and machinery policy.

Royal next cites *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Wausau Paper Mills*, 818 F.2d 591 (7th Cir.1986). In that case, again involving an all-risk policy, not a boiler and machinery policy, the insured attempted to

recover under its policy for repairs it made to a corroded reactor used to burn paper-product waste. *Id.* at 592. The policy excluded rust or corrosion from coverage. *Id.* The court held that coverage was rightfully denied. The case supports Pioneer's position rather than Royal's because in *Arkwright,* unlike the case before us, there was never any accident. The insured simply repaired a corroded piece of equipment and sought reimbursement for those costs. Pioneer has maintained all along that Royal is not obligated to pay off under the Policy if Pioneer's equipment corrodes or erodes when there is no accident (e.g. Royal does not have to pay for the cost to repair or replace the three tubes in the liquefier corroded by the brine stream). But, if corrosion results in an accident (e.g. failure of the liquefier tubes and the release of forty-two tons of chlorine into the atmosphere), damages from the accident are covered. *Arkwright* supports this position: simple maintenance replacements and repairs are not covered; damages from accidents are covered.

Royal next cites *Adams–Arapahoe Joint Venture School Dist. No. 28–J v. Continental Ins. Co.,* 891 F.2d 772 (10th Cir.1989). In that case, the insured tried to argue that the rate at which the loss proceeded precluded it from being corrosion damage because by its nature corrosion is a slow process. *Id.* at 773. The court ruled that the language in the all-risk policy precluded this argument because the policy expressly excluded "any loss caused by ... rust or corrosion." *Id.* Thus, the speed at which the corrosion occurred was irrelevant. *Id.* Again, just as in *Bettigole,* the policy contains express language excluding from coverage loss caused by corrosion. Further, as in *Arkwright,* the issue in the case was the proper interpretation of the term "corrosion." The case did not discuss the issues raised by Pioneer before this court.

Royal argues that *Resorts Int'l, Inc. v. American Home Assurance Co.,* 311 So.2d 806 (Fla.Dist.Ct.App.—1975), clearly supports its interpretation of the Policy. In that case, the insured's air conditioning failed and the insured sought recovery under its boiler and machinery policy. The insurer refused coverage because the failure was caused by corrosion. Corrosion was specifically excluded from coverage under the terms of the policy. Without discussing the insuring language of the policy (a fact for which Royal has continually criticized the cases cited by Pioneer), the Florida court held:

> ... the record on appeal demonstrates that it is undisputed that the air-conditioning failures were the result of corrosion, a cause which is specifically excluded under both policies ... the trial court was imminently correct in entering summary final judgment in favor of [the insurers].

*Id.* at 807.

We do not find this case persuasive for the simple reason that the opinion never tells us what the insured was seeking coverage for. If the insured was seeking coverage because its air conditioner was corroded and therefore, inoperative, the insurer was correct in denying coverage. This appears to be the case because there is never any mention of damages caused by the failure of the air conditioner. However, if the air conditioner became corroded, then burst or exploded damaging other equipment or property covered under the policy, the damage might have been covered. We just do not know what the event was for which coverage was sought. As we stated above, even if we were to find that *Resorts Int'l* supports Royal' position, it would mean only that the policy language in question is susceptible of more than one reasonable interpretation because courts have interpreted similar provisions in different fashions. *Compare Cyclops,* 352 F.Supp. at 931 (holding policy covered damage caused by corrosion) *with Resorts Int'l,* 311 So.2d at 806 (holding policy did not cover damage caused by corrosion); *see also* Nora A. Uehlein, Annotation, *Boiler and Machinery Insurance: Risks and Losses Covered by Policy or Provision Expressly Covering Boilers and Machinery,* 49 A.L.R. 4th 336, 343 (1986) (construing language concerning damage caused by accidents in boiler and machinery policies, courts in a number of

cases have found insurers liable; however, a few courts have found evidence insufficient to constitute an accident within meaning of the policy). Therefore, summary judgment for Royal was improper because exclusions must be construed in favor of the insured if the interpretation propounded by the insured is not unreasonable and the policy language in question is susceptible to more than one reasonable interpretation. *See Hudson,* 811 S.W.2d at 555; *Bonner,* 841 S.W.2d at 506.[3]

Royal not only denied coverage based on the causation issue, but also claimed that Pioneer's losses are not covered by the Policy because the incident was not "sudden and accidental." Royal contends that because of the extended time period during which the corrosion damage to the three liquefier tubes developed, the incident was not "the sudden and accidental breakdown of an Object" as required by the Policy.

■ This argument has either been directly proposed and rejected by the courts in the cases previously cited by Pioneer in support of its contentions, or have been rejected by implication under the facts of the case. In *Cyclops,* this issue was addressed in detail, with the court taking the time to define "sudden" and "accidental" from Webster's Seventh New Collegiate Dictionary and Black's Law Dictionary. 352 F.Supp. at 934–35. "Sudden" was defined by the court as "without previous notice, unexpectedly or unforeseen," or "happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." *Id.* at 934. "Accidental" was defined as "occurring by change or unexpectedly" or "happening by change, or unexpectedly; taking place not according to usual course of things; casual; fortuitous." *Id.* at 935. The court held that even though the wear and tear that caused the electric motor to malfunction may have taken a considerable amount of time, the actual shut down of the motor was both sudden and accidental.

*Cyclops,* 352 F.Supp. at 937. Clearly, the court did not consider "sudden and accidental" to be a function of time. This reasoning is supported by the definitions of the two words; neither has anything to do with time, they have to do with surprise and lack of foreseeability.

In *Lakeshore,* the courts again confronted the position asserted by Royal that there was no accident because the incident was not "sudden and accidental." In that case, the insurer made the very same argument propounded by Royal, i.e., Hartford argued that because corrosion is not a sudden process, any hole caused by corrosion is, by definition, not sudden. *Lakeshore,* 296 S.E.2d at 422. The court, in rejecting the argument, held that even though corrosion led to the expulsion of the valve seat in the cylinder, the expulsion itself was sudden and accidental. *Id.* Here, while the corrosion/erosion mechanism that caused the holes in the liquefier tubes was slow, the breach of the tubes was instantaneous, and therefore, sudden and accidental. Similarly, in *Riefflin,* it is apparent that the scale build-up in the hotel boiler was a process that required a certain amount of time; however, it is clear that the cracking of the boiler sections was sudden and accidental even though the scaling which caused it was not. 521 P.2d at 676.

Under the reasoning of these cases, the time it actually took for the erosion/corrosion mechanism to breach the tubes is immaterial. The actual penetration of the tubes was unexpected and unforeseen, complying precisely with the definitions of "sudden" and "accidental." At one point in time, the tubes were whole, an instant later they were breached. Therefore, Royal's argument is without merit.

■ Beyond the cases cited by both sides, we hold that the Policy itself lends credence to Pioneer's interpretation. First, the definition of "accident" in the policy is clear. It states that corrosion is not an

---

3. The application of *Forbau v. Aetna Life Ins. Co.,* 37 Tex.Sup.Ct.J. 345, 346–47, 876 S.W.2d 132, 133–135 (1994) in this scenario has previously been discussed in relation to disputes over policy construction and need not be repeated.

"accident." The Policy does not state that a sudden and accidental breakdown caused by corrosion is not an accident. If Royal had wanted to exclude accidents caused by corrosion, it could have easily done so. This is supported by the fact that Royal did include causation language in other exclusions in the same Policy. For example, Royal excluded not only "fires" and "explosions" from coverage, but also excluded "an 'accident' that is the direct or indirect result of an explosion or fire." Royal did the same for other exclusions, for example:

(1) loss caused by or resulting from nuclear reaction;

(2) loss caused by or resulting from war.

While Royal was careful to include the phrase "caused by or resulting from" in other exclusions, it specifically left those terms out of the exclusions contained within the definition of "accident." Thus, Royal obviously knew how to exclude from coverage losses caused by certain events and could have done so with corrosion. We must presume that such an omission was purposeful. *Borders v. KRLB*, 727 S.W.2d 357, 359, 60 (Tex.App.— Amarillo 1987, writ ref'd n.r.e.). At the very least, the omission creates an ambiguity precluding summary judgment for Royal.

▪▪▪ Since Royal chose not to insert the causation language in the exclusions under "accident," it was error for the trial court to insert causation language in those exclusions. *See Praeger v. Wilson*, 721 S.W.2d 597, 601 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.) (holding that court may not construe a writing in a manner that effectively inserts a qualifying phrase when to do so alters the plain meaning of the writing).

In light of our review of the entire policy and the holdings in cases interpreting similar policy language, we conclude that the exclusion in this case is capable of more than one reasonable interpretation: (1) only corrosion itself is excluded from coverage; or (2) any loss or damage caused by corrosion is excluded. We also conclude, however, that the first construction is the more reasonable and cor-

rect interpretation. Under the Texas Supreme Court's opinion in *National Union Fire Ins. Co. v. Hudson Energy Co.*, we are required to construe the exclusion in this case in favor of Pioneer and against Royal. Therefore, we sustain Pioneer's first two points of error and reverse the judgment of the court below and render judgment for Pioneer on the issue of contractual liability. However, we must remand the case back to the trial court on this issue for a determination of Pioneer's damages under the terms of the policy.

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

In its third point of error, Pioneer claims the trial court erred in granting Royal's motion for partial summary judgment on Pioneer's claim that Royal had breached its duty of good faith and fair dealing. Pioneer claims the trial court erred when it erroneously decided that Royal had a reasonable basis to deny coverage as a matter of law.

In its motion for partial summary judgment, Royal argued that because it had conducted an investigation and determined that the holes in the tubes in the secondary liquefier were caused by erosion/corrosion mechanism, it had a reasonable basis to deny coverage because corrosion is excluded from the definition of "accident" in the Policy. Pioneer argued that whether Royal had accurately concluded that the holes in the tubes were caused by erosion/corrosion was irrelevant because there has never been any dispute on this fact. Pioneer claimed that the real issue was whether Royal was reasonable in denying coverage once the fact was established. Pioneer's position is that Royal breached its duty of good faith and fair dealing because once the facts were established, Royal improperly and unreasonably applied the Policy to the facts. Pioneer claims Royal had no reasonable basis to deny coverage given the language of the Policy, the out-of-state cases construing that language, and the rules of construction governing insurance contracts.

▪▪▪ In *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987), the

Texas Supreme Court recognized a duty on the part of insurers to deal fairly and in good faith with their insureds. The court recognized that a duty of good faith and fair dealing may arise as a result of a special relationship between the parties created by contract, but held that in the insurance context:

> [A] special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims.

*Id.* at 167.

The court went on to state that without such a duty, insurance companies could arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. *Id.* For these reasons, and the fact that the insurer has absolute control over evaluation, processing, and denial of claims, an insurer must act in good faith and deal fairly with its insureds. *Id.*

 A cause of action for the breach of the duty of good faith and fair dealing is stated when an insured alleges there is no reasonable basis for the insurer's denial of a claim, there is a delay in payment by the insurer, or there is a failure on the part of the insurer to investigate. *Id.* The plaintiff in a bad faith case must prove that no reasonable basis existed for denying the insurance claim. *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 283 (Tex.App.—San Antonio 1992, writ denied). It is not enough for the insured to show that the insurer should have known to pay the claim, or that there were other facts suggesting the claim was valid; rather, the insured must show that no reasonable basis existed for denying the claim. *Id.* [citations omitted] Further, the plaintiff must prove that the insurer knew or should have known that there was no reasonable basis for denying coverage. *Id.* (citing *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 213 (Tex.1988)). The insurance carrier is held to that degree of care

and diligence which "a man of ordinary prudence would exercise in the management of his own business." *State Farm Fire & Cas. Co. v. Simmons*, 857 S.W.2d 126, 133 (Tex. App.—Beaumont 1993, writ denied) (citing *Aranda*, 748 S.W.2d at 167)). Insurers maintain the right to deny questionable claims without being subject to liability for an erroneous denial of a claim. *St. Paul Lloyd's Ins. v. Fong Chun Huang*, 808 S.W.2d 524, 526 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (citing *Aranda*, 748 S.W.2d at 213)). A court's determination to deny an insured's claim for breach of the duty of good faith and fair dealing should not be based on the insurer's success or failure in court on liability for the claim. *St. Paul Guardian Life Ins. Co. v. Luker*, 801 S.W.2d 614, 621–22 (Tex.App.—Texarkana 1990, no writ). The denial of coverage may be erroneous but still be in good faith if it was based upon the information which was available to the insurer at the time coverage was denied and the information supported denial. *Id.* When there is a bona fide controversy, the insurer has a right to have its day in court without facing a bad faith claim. *See id.*

 Pioneer argues that because the Policy can and should be construed as it contends, there are fact questions presented as to whether Royal breached its duty. Pioneer argues that when Royal denied coverage it knew or should have known that Pioneer's construction of the policy had been considered and rejected "by virtually all of the court's considering its position." Therein lies the rub; not all of the cases went Pioneer's way, and even the cases that we interpret as supporting Pioneer's position do not contain the **exact** language of Pioneer's policy, or else do not discuss the issues in the manner in which they were presented in this lawsuit. Also, these cases are not Texas cases and the courts of this state are not **bound** by a foreign court's construction of the terms of an insurance policy, though we can look to other jurisdictions for guidance. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 295–97 (Tex.1993) (holding that Texas courts are only obligated to follow

decisions by higher Texas courts and the United States Supreme Court); *Mohamed v. Exxon Corp.*, 796 S.W.2d 751, 753–54 (Tex. App.—Houston [14th Dist.] 1990, writ denied). At the time coverage was denied and up until this decision, there were no Texas cases considering the language involved in the Policy. Thus, even if we take Pioneer's position that Royal knew about these out-of-state cases when it denied coverage, it does not support Pioneer's claim that Royal breached its duty of good faith and fair dealing. As long as Royal had some reasonable basis to deny the claim there is no breach. Evidence that merely shows a bona fide dispute about the insurer's liability on the insurance contract does not rise to the level of bad faith. *Transportation Ins. Co. v. Moriel*, 37 Tex.Sup.Ct.J. 450, 455 (Feb. 2, 1994) (citing *National Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373 (Tex.1994) and *National Union Fire Ins. Co. v. Hudson Energy Co.*, 780 S.W.2d 417, 426 (Tex.App.—Texarkana 1989), *aff'd*, 811 S.W.2d 552 (Tex.1991)). Nor is bad faith established when a trier of fact, using hindsight, decides the insurer was simply wrong about the proper construction of the terms of the policy. *Id.* (citing *Lyons v. Millers Casualty Ins. Co.*, 866 S.W.2d 597, 601 (1993)). The fact that we have determined that coverage exists is immaterial to the breach of duty claim in this case. *See Luker*, 801 S.W.2d at 621–22. "[T]he issue in bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim." *Lyons*, 866 S.W.2d at 601. Pioneer's third point of error is overruled.

## BREACH OF THE DUTY TO INVESTIGATE

In point of error four, Pioneer claims the trial court erred in granting Royal's motion for partial summary judgment on Pioneer's claim that Royal had breached its duty to investigate. Royal moved for summary judgment on the basis that Pioneer had failed to state a cause of action since there was no duty to investigate apart from the duty of good faith and fair dealing. The trial court granted Royal's motion.

First, we note that Royal has mischaracterized Pioneer's contention. We do not read Pioneer's petition as claiming that there is a **separate cause of action** based on a breach of the duty to investigate; rather, Pioneer claimed, in its Third Amended Petition, that Royal had breached its duty of good faith and fair dealing by unreasonably denying coverage and failing to adequately investigate the incident before the denial. The breach of the duty to investigate claim was simply a second prong of Pioneer's claim based on Royal's alleged breach of the duty of good faith and fair dealing. Pioneer claims that since Royal did not investigate, it should have to pay the cost of the investigation conducted by Pioneer: one and a half million dollars ($1,500,000.00).

Royal does not dispute the fact that it had a duty to investigate the incident; rather, Royal claims that it did investigate and after the investigation, decided to deny coverage. Pioneer claims that Royal did not investigate the claim independently, instead Royal relied on tests and reports done by Pioneer's engineers, and therefore, conducted no investigation and should have to pay for the investigation done by Pioneer. We disagree.

Pioneer notified Royal on the day of the incident, May 6, 1991. Royal kept in daily contact by phone with Pioneer after the incident. On May 13, 1991, Royal sent a representative, Phil Schaefer, to the plant. Prior to Schaefer's arrival, Pioneer hired two engineering firms, Failure Analysis and Rimkus, to investigate the incident. This was done at Pioneer's own instance. Royal never asked or required Pioneer to hire its own investigators. Once Schaefer arrived at the plant, he observed the work and investigation performed by Pioneer's engineers. Failure Analysis performed numerous tests and procedures to determine the cause of the incident. Schaefer left the plant when it reopened on June 10, 1991. After Schaefer left the plant, he went to Failure Analysis' Menlo Park location to view the parts of the liquefier and piping affected by the incident.

On June 16, 1991, Royal hired Packer Engineering to participate in the investigation. On June 20, 1991, Royal's attorney asked Pioneer to share with Packer all information gathered by Pioneer in its investigation, particularly the "hard data" obtained by Failure Analysis. In the letter, Royal asked if Packer could attend any future tests conducted by Pioneer's engineers. Pioneer complied with the requests and continued to share information with Royal and its engineers. Thereafter, in August of 1991, Packer Engineering observed an inspection of the rag found in the liquefier and in October, attended a presentation by Failure Analysis. In that presentation, Failure Analysis gave a detailed description of its investigation and presented its conclusions and opinions reached as to the cause of the incident. William Shenberger, a claims adjustor for Royal, also attended the October presentation.

On March 5, 1992, Shenberger wrote a letter to Pioneer that stated: "Following an investigation and evaluation of the circumstances surrounding the May 6, 1991 incident, including attending the presentation made by Failure Analysis and review of other information supplied by Pioneer ..." coverage is denied. After Royal denied coverage, Pioneer received a copy of the report prepared by Packer Engineering. In that report, Packer stated that its investigation consisted of the following:

> (i) a visit to Pioneer's plant to review Failure Analysis' October 1991 presentation, (ii) a review of information and photographs provided by Failure Analysis, (iii) a visit to Pioneer's plant to watch Failure Analysis' test of the "rag", and (iv) a review of Failure Analysis' report.

Pioneer complains that Royal "piggybacked" its investigation and therefore, should be required to reimburse Pioneer for the amount expended on the investigation. Royal argued that the fact that it relied on the investigation conducted by Pioneer's engineers does not mean that Royal did not investigate and should be required to pay Pioneer for its investigation. We agree.

Black's defines an investigation as follows:

> To follow up step by step by patient inquiry or observation. To trace or track; to search into; to examine and inquire into with care and accuracy; to find out by careful inquisition; examination; the taking of evidence; a legal inquiry.
>
> The process of inquiring into or tracking down through inquiry.

BLACK'S LAW DICTIONARY 825 (6th ed. 1990). The key words in the definition are "inquiry," "observation," and "examination." These are precisely the things done by Royal. It made inquiries, it observed tests and procedures conducted by Pioneer's engineers, and examined, through its own engineering firm, the reports and tests produced by Failure Analysis and Rimkus.

■ We have found nothing in the terms of the Policy or in any caselaw that requires Royal to reinvent the wheel. Once Pioneer had its engineers running tests, making presentations, and preparing reports, there was no reason for Royal to duplicate the work done by Pioneer's engineers. Royal did conduct an investigation, it simply used the information provided by Pioneer. We find no merit in Pioneer's argument that Royal was required to pay for the investigation. Royal did not require Pioneer to hire the engineers. Royal asked for the information obtained and Pioneer freely gave that information. Royal hired its own engineering firm to review the tests and results obtained by Failure Analysis and Rimkus. It sent adjustors and representatives to the plant and to view tests performed by the engineers. This in and of itself constitutes an investigation. Royal did fulfill its duty to Pioneer by pursuing a thorough, systematic, objective, fair and honest investigation before it denied coverage. *See Simmons*, 857 S.W.2d at 136. It simply used information gathered by Pioneer. The record shows as a matter of law that Royal did conduct an investigation and therefore, did not breach its duty of good faith and fair dealing. Pioneer's fourth point of error is overruled.

## STATUTORY CLAIMS

In its fifth point of error, Pioneer contends the trial court erred in dismissing all of

Pioneer's claims against Royal asserted under the Texas Insurance Code, the Texas Administrative Code, and the Texas Deceptive Trade Practices Act. The trial court ruled that Pioneer's statutory claims were rendered moot by virtue of its rulings on coverage, breach of the duty of good faith and fair dealing, and breach of the duty to investigate. Both parties agree that if this court reverses any of the trial court's rulings, Pioneer is entitled to have its statutory claims reversed and remanded. Since we have decided that Pioneer is entitled to coverage under the Policy as a matter of law, we reverse and remand its statutory claims to the trial court. Pioneer's fifth point of error is sustained.

The judgment of the trial court is reversed and judgment is rendered in favor of Pioneer on the issue of contractual liability. This claim is remanded to the trial court for a determination of the proper amount of damages due under the terms of the Policy. The trial court's judgment as is relates to the breach of the duty of good faith and fair dealing, both as to Pioneer's claim that denial of coverage was unreasonable and that Royal failed to investigate the incident, is affirmed. The trial court's judgment dismissing Pioneer's statutory claims as moot is reversed and these claims are remanded to the trial court for further action.