### 64017. LAKESHORE MARINE, INC. v. HARTFORD ACCIDENT & INDEMNITY COMPANY.

POPE, Judge.

Lakeshore Marine, Inc. brought this action against Hartford Accident & Indemnity Company seeking recovery for a loss pursuant to an insurance policy which provided boiler and machinery coverage. In its complaint Lakeshore asserted that a certain chlorine tank, which was an integral part of the water system serving its property, "suddenly and unexpectedly began releasing the chlorine gas contained therein into the atmosphere." Hartford denied coverage under the policy and moved for summary judgment. Lakeshore moved for summary judgment on the issue of liability. Lakeshore brings this appeal from the trial court's grant of Hartford's motion and the denial of its motion.

1. In its order the trial court found: "1. The burden is on the Plaintiff [Lakeshore] to establish as one essential of its case that it [is] entitled to insurance benefits under the terms of the policy. *Zurich Ins. Co. v. Waite,* 144 Ga. App. 425 [(3) (240 SE2d 914) (1977)]. 2. Plaintiff has failed to establish that the tank from which escaped the chlorine gas causing the damage was covered under the terms of the policy. 3. Plaintiff further has failed to establish that the damage

to its property resulted from an accident as defined in the policy." Lakeshore contends that the trial court impermissibly placed the burden upon it in this case because *Zurich Ins. Co. v. Waite,* supra, recited the burden upon a plaintiff necessary to overcome a motion for directed verdict, not summary judgment.

" 'The trial court's function in ruling on a motion for summary judgment is analogous to the function it performs when ruling on a motion for directed verdict. The essence of both motions is that there is no genuine issue of material fact to be resolved by the [trier] of the facts, and that the movant is entitled to judgment on the law applicable to the established facts.' " *Summer-Minter &c., Inc. v. Giordano,* 231 Ga. 601, 604 (203 SE2d 173) (1973), quoting *Standard Acc. Ins. Co. v. Ingalls Iron Works Co.,* 109 Ga. App. 574, 575 (136 SE2d 505) (1964). See *Waldrep v. Goodwin,* 230 Ga. 1 (1) (195 SE2d 432) (1973). "On a motion for summary judgment the burden of establishing the nonexistence of any genuine issue of material fact is upon the movants . . . and the evidence must be construed most strongly against them." *Marsh v. Berens,* 237 Ga. 135, 136 (227 SE2d 36) (1976). Since both parties in the case at bar moved for summary judgment, each had the foregoing burden as to its own motion. Therefore, the trial court did not impermissibly place upon Lakeshore the burden of establishing its entitlement to recovery under the insurance policy. Although the trial court's order makes no mention of Hartford's burden on its motion for summary judgment, we will presume, in the absence of anything in the record to the contrary, that the trial court applied the appropriate standard. Code Ann. § 38-114; see *Touchton v. Stewart,* 229 Ga. 303 (190 SE2d 912) (1972).

2. The evidence of record shows that two chlorine tanks were attached to a V-100 chlorinator system on the premises of Lakeshore Marine, Inc. The chlorinator system was used to chlorinate the water in the restaurant located on the premises. Both tanks were filled with chlorine gas under pressure. Suddenly, without warning or any prior leakage, the chlorine in one of the tanks began escaping at a rapid velocity, spewing chlorine gas into the air with a loud fizzing noise. The tank emptied into the surrounding area within a few minutes, causing considerable damage to the premises and its contents.

A consulting physicist on the faculty of the Georgia Institute of Technology disassembled and examined the subject chlorinator system. By deposition he testified that his examination revealed that the system was a hydropneumatic system which allowed chlorine gas under pressure to be released from tanks through a control unit to an attached water system. He testified, "The heart of the system is the

injector. This is a Venturi-type system, which produces a vacuum as water flows through the system. This vacuum that is produced is passed through a control unit into a cylinder unit in order to actuate the cylinder unit to release chlorine from the tank . . . [C]hlorine is released, then, in response to water-flow through the injector. The control unit has a manual knob on it . . . which enables you to set the pounds per day of chlorine that you wish to inject into your water system. Once you make that setting with a manual knob, the control unit has an automatic diaphragm system in it which will maintain a constant pressure across this manual control system, so that any varying pressure in the chlorine tank will still result in a constant flow of chlorine gas into the injector system. . . . [E]ach of these components . . . [is] connected by plastic tubing."

The escape of the chlorine gas was initiated by the breakdown of the check valve "O" ring in the injector. The function of the check valve was to prevent water from backflowing into the system when the water flow through the injector had been cut off. Some time elapsed after this breakdown prior to the failure of the cylinder unit on the chlorine tank, the point at which the gas escaped. Fragments of the disintegrated "O" ring from the injector check valve eventually caused the second check valve, this one in the control unit, to remain open, permitting water to pass through the entire system down into the cylinder unit on the chlorine tank. This water mixed with the chlorine gas creating a highly corrosive liquid within the cylinder unit. The physicist explained how the gas escaped: "As the cylinder unit corroded — the corrosion around the metal surrounding the valve seat in the cylinder unit — the corrosion proceeded to the extent that there was a sudden expulsion of the valve seat from the surrounding metal caused by the pressure of the valve stem spring beneath the seat, and that caused a sudden release of chlorine into the cylinder unit. And, also, prior to that there [was] a clamping screw on a diaphragm in the cylinder unit. Now, the head of that clamping screw had parted from the threaded part of the shaft. . . . The chlorine gas escaped from a vent hole behind the diaphragm in the cylinder unit. And it was able to escape through that vent hole because of the fact that the clamping screw head had parted from the threaded part of the shaft. And this had occurred prior to the failure of the valve seat in the cylinder unit."

The subject insurance policy provided coverage to Lakeshore ". . . respecting loss from an Accident, as defined herein, occurring while this endorsement is in effect, to an Object, as defined herein, while the Object is in use or connected ready for use at any Location specified in the declarations. . . ." At issue in this case is whether the subject chlorine tank was an "Object" covered by the policy and, if so,

whether the escape of the chlorine gas was an "Accident" so covered.

(a) As is pertinent to this case "Object" is defined by the policy as "any metal unfired pressure vessel as follows: . . . hydro-pneumatic tank. . . ." Hartford argues that the subject chlorine tank was not, in and of itself, a hydropneumatic tank but merely a tank for the containment of chlorine. Thus, Hartford contends, the tank in this case was not an "Object" covered by the policy. Lakeshore contends that the subject tank, as part of the hydropneumatic system at the time of the loss, was indeed a hydropneumatic tank and, thus, covered by the policy. In this regard, the policy is clearly susceptible to two constructions and, thus, is ambiguous. This ambiguity may be resolved by applying the appropriate rules of construction.

"Words generally bear their usual and common signification; but technical words, or words of art, or used in a particular trade or business, will be construed, generally, to be used in reference to this peculiar meaning." Code Ann. § 20-704(2). "This rule is applicable in interpreting insurance policies and our courts use it in conjunction with the rule that the policy of insurance like other contracts is construed most strongly against the party who prepares it." *Johnson v. U. S. F. & G. Co.,* 93 Ga. App. 336, 341 (91 SE2d 779) (1956). The physicist described the subject hydropneumatic system as being composed of three parts: the water injector unit, the control unit and the cylinder unit on the chlorine tank. Standing alone, the chlorine tank was not a hydropneumatic tank. He stated, however, "[T]o the extent it is used in the system, I would consider it a hydropneumatic tank, because it is actuated, that is, the tank is actuated in the system by hydropneumatic principles. . . . [T]he system wouldn't work without it, and you wouldn't get gas out of the tank without it." The subject tank was attached to the hydropneumatic system at the time of the loss. Accordingly, we conclude that said tank was an "Object" covered by the insurance policy.

(b) As is here pertinent the policy defines "Accident" thusly: "Accident shall mean a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of its occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof, but Accident shall not mean (a) depletion, deterioration, corrosion or erosion of material . . . (c) leakage at any valve. . . ." Hartford argues that the escape of the chlorine gas in this case was not an "Accident" under the terms of the policy because the "leakage took place at the valve" and also "was the result of corrosion which caused the gradual decay of valve components in the . . . chlorinator system."

"When an insurer invokes an exclusionary provision in a policy of insurance as applying to an event[,] it has the burden of showing

that the facts come within the exclusion." *American Motorist Ins. Co. v. Sutton,* 148 Ga. App. 872, 873 (253 SE2d 256) (1979). The undisputed facts of record show that the chlorine gas escaped from the chlorinator valve on the top of the tank. This escape was described as sudden and rapid, spewing chlorine gas into the air with a loud fizzing noise. The physicist stated, "The expulsion of chlorine gas into the atmosphere . . . was initiated by the sudden unseating of the valve seat in the cylinder unit caused by the pressure of the cylinder spring. Now, a chlorine tank, a full chlorine tank of this type, at an ambient temperature of eighty degrees Fahrenheit, will have a gas pressure of 100 PSI. So, this would cause a very sudden explosion of gas from the system." Webster's New International Dictionary 1407 (2d ed. 1955) defines "leak" as "to enter or escape (contrary to what is intended), as a fluid, through a hole, crevice, etc.; to pass gradually into, or out of, something . . . To permit or cause to flow or escape little by little. . . ." The escape of gas in this case was neither gradual nor little by little; therefore, notwithstanding the fact that the gas escaped at a valve, a reasonable person in the position of Lakeshore would understand the sudden ejection of gas from the chlorinator system in this case to be other than "leakage." See generally *Greer v. IDS Life Ins. Co.,* 149 Ga. App. 61 (1B) (253 SE2d 408) (1979).

Also, the policy provides that "Accident" shall not mean "corrosion . . . of material." Hartford argues that a reasonable interpretation of this language dictates the conclusion that corrosion is to be a qualifying element of suddenness such that a sudden escape of gas caused by corrosion is not a loss covered under the policy. Lakeshore counters that this exclusion refers to the accident itself; that is, although corrosion was present within the chlorinator system, corrosion is not the event out of which this action arose. "Corrosion," as the term is now generally used, means "a gradual wearing away or disintegration by a chemical process, as in the rusting of iron." Webster's New International Dictionary 599 (2d ed. 1955). Clearly, corrosion was a factor in the ultimate escape of the chlorine gas in this case. However, applying the circumstances in this case to this language of the policy, we conclude that the escape of the gas is not excluded from coverage by this provision of the policy.

"We are guided in this case by the rule of construction that where the language contained in an insurance policy is susceptible to two or more constructions, the one most favorable to the insured will be adopted." *Alley v. Great American Ins. Co.,* 160 Ga. App. 597, 600 (287 SE2d 613) (1981). This language of the policy is indeed susceptible to more than one construction. The undisputed facts of

record show an "Accident," i.e., a sudden and accidental breakdown of an "Object." While the language of the policy clearly precludes corrosion itself from being an "Accident," there is no express language excluding a sudden and accidental breakdown of an "Object" *resulting from* (at least in part) corrosion. " 'Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms.' " *Alley,* supra at 600. If Hartford had indeed intended to exclude from coverage a sudden and accidental breakdown of an "Object" resulting from corrosion, more apt and definitive language would undoubtedly have been used. Therefore, we conclude that the loss in this case was covered under the terms of the policy.

3. The status of this case on motion for summary judgment does not alter the rules of construction applicable to contracts. For example, even though it is the insured who has moved for summary judgment, a contract is nonetheless construed most strongly against the insurer. The facts of record relating to the loss were essentially without dispute. Therefore, the only issue presented to the trial court was a matter of law — whether or not the loss was covered under the insurance policy. Construing the insurance policy in light of the facts relating to the loss was a matter for the trial court, and no jury question would be raised unless after application of all applicable rules of construction an ambiguity remained. *Farm Supply Co. v. Cook,* 116 Ga. App. 814 (1) (159 SE2d 128) (1967).

As set forth in Division 2 of this opinion, certain ambiguities occur when the subject insurance policy is construed in light of the facts relating to the loss. No ambiguities remain, however, after application of the appropriate rules of construction. Applying these rules of construction, we arrive at a different interpretation of the subject insurance policy than that of the trial court. Cf. *Interstate Fire Ins. Co. v. Nat. Indem. Co.,* 157 Ga. App. 516 (277 SE2d 802) (1981). Accordingly, the judgment of the trial court is reversed with direction that summary judgment be entered in favor of Lakeshore Marine, Inc. on the issue of liability.

*Judgment reversed with direction. Deen, P. J., and Sognier, J., concur.*

DECIDED OCTOBER 26, 1982 —
REHEARING DENIED NOVEMBER 17, 1982 —

*Ralph F. Simpson,* for appellant.

*John W. Denney, Allen C. Levi,* for appellee.