United States Court of Appeals,

Eleventh Circuit.

No. 94-8989.

UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff-Appellee,

v.

PARK 'N GO OF GA., INC., Defendant-Appellant.

Oct. 10, 1995.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:93-cv-1541-JEC), Julie E. Carnes, Judge.

Before HATCHETT and EDMONDSON, Circuit Judges, and GIBSON[*], Senior Circuit Judge.

PER CURIAM:

Park "N Go appeals the district court's grant of summary judgment in favor of United States Fidelity & Guaranty in this declaratory judgment action. Because resolution of this case involves questions of Georgia law which are dispositive but unanswered by the precedent of the Supreme Court of Georgia, we defer our decision in this case pending certification of the following question to the Supreme Court of Georgia pursuant to GA. CONST. art. VI, § 6, para. 4, O.C.G.A. § 15-2-9, and Rule 37 of the Supreme Court of Georgia. *See Polston v. Boomershine Pontiac-GMC Truck, Inc.,* 952 F.2d 1304 (11th Cir.1992). We submit the following facts and analysis for consideration by the Supreme Court of Georgia.

> CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF GEORGIA PURSUANT TO ARTICLE VI SECTION VI PARAGRAPH IV OF THE GEORGIA

---

[*]Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

CONSTITUTION.

TO THE SUPREME COURT OF GEORGIA AND THE HONORABLE JUSTICES THEREOF.

## STYLE OF THE CASE

The case is styled this way:  Park "N Go of Georgia, Inc., Appellant, versus United States Fidelity and Guaranty Company, Appellee, Case No. 94-8989, filed in the United States Court of Appeals for the Eleventh Circuit, on appeal from the United States District Court for the Northern District of Georgia.

## FACTS

Park "N Go of Georgia, Inc., is a Georgia corporation that operates a parking/shuttle service near Atlanta Hartsfield International Airport.  The parking facility consists of a 13-acre parking lot surrounded by a fence six or seven feet high.  An office building and entrance and exit gates are located at the front of the lot.  Park "N Go operates with a limited staff and without a security system or security personnel.

To enter the parking facility, a customer drives his vehicle up to a ticket machine located at the entrance gate and takes a bar-coded ticket stamped with the date and time of entry.  The customer then drives into the parking lot, finds a parking space, parks and locks his vehicle, and takes the keys with him.  An airport shuttle takes the customer to the appropriate airport terminal.  No other way exists for a customer lawfully to enter the Park "N Go lot.

Upon returning, a Park "N Go shuttle transports the customer from the terminal to the place where his vehicle is parked.  To leave the parking facility, the customer drives his vehicle up to

a cashier's window located next to the exit lane, presents the bar-coded ticket, and pays the amount calculated by a fee computer. This contact is normally the only interaction a customer has with a Park "N Go employee. The customer then exits the facility. No other way exists for a customer lawfully to leave the Park "N Go lot.

In 1991, Park "N Go contracted with United States Fidelity & Guaranty Co. ("USF & G") to insure Park "N Go's business. USF & G issued Policy No. 1MP1334231140 effective until November 1992. The policy included several kinds of coverage. Portions of the policy at issue in this case include: (1) the Garage Coverage Part—Liability Coverage with a liability limit of $1 million, (2) the Garage Coverage Part—Garage Keepers Coverage with a liability limit of $250,000, and (3) the Commercial General Liability Coverage with a liability limit of $1 million.

While this policy was in effect, torrential rains fell in the Atlanta metropolitan area, and the Park "N Go parking lot was flooded. Over 200 automobiles parked in the lot were damaged. A group of Park "N Go's patrons filed in the state court in Fulton County, Georgia, a class action suit against Park "N Go, alleging that a bailment relationship existed, alleging that Park "N Go was negligent, and seeking to recover for damages to their vehicles caused by the flooding.

USF & G then filed in the United States District Court a declaratory judgment action against Park "N Go on the insurer's obligations under the insurance policy. Park "N Go answered the complaint, disputing USF & G's interpretation of the contract. USF

& G then moved for summary judgment, asserting that its obligation was limited to $250,000 as stated in the Garage Keepers Coverage portion of the policy, instead of the $1 million limit provided in the Garage Liability Coverage and the Commercial General Liability Coverage portions of the policy.

The district court granted USF & G's Motion for Summary Judgment. The court concluded that "because the autos parked and damaged in defendant's lot were necessarily in the "care' of defendant, that provision of the policy excluding from coverage personal property in the "care, custody or control' of the insured applies." The district court noted that Georgia law is unclear on the issue of bailment and unclear on whether a disclaimer on the ticket to park is valid; but the court still concluded that a bailment relationship existed between Park "N Go and its patrons and concluded that "the mere existence of a printed disclaimer on the parking ticket does not operate to rebut the statutory presumption of a bailment relationship between the defendant and its patrons."

ARGUMENTS PRESENTED

*A. Whether a Bailment Relationship Existed:*

Park 'N Go argues that the Garage Liability and Commercial Liability Coverage provisions of the policy cover the damages caused to its patrons' vehicles as a result of the flooding, and Park 'N Go says that the exclusion from those provisions for vehicles within Park 'N Go's "care, custody or control" does not apply because those vehicles were not within Park 'N Go's "care, custody or control," particularly considering that no bailment

relationship existed.

In concluding that the vehicles were in Park 'N Go's "care, custody or control," the district court considered (1) the specific terms of the insurance policy and (2) Georgia law on the issues of bailment and disclaimer. First, the court noted that the Garage Keepers portion of the policy provided coverage for covered autos left in the insured's *care* while the insured is " "attending, servicing, repairing, parking or storing it in [its] garage operations.' " From this, the district court concluded that, whenever the insured is parking or storing an auto, the auto necessarily is in the *care* of the insured, and the "care" component of the "care, custody or control" exclusion is met.

Second, the district court concluded that if the terms of the contract itself did not sufficiently define the terms, Georgia law of bailment would apply to give meaning to the phrase "care, custody or control." The court noted that, although the law of bailment is not absolutely clear on the question, Georgia statutory law provides that "[t]he relationship of the owner of an automobile and the owner of the garage in which the automobile is stored is that of bailor and bailee." *See* O.C.G.A. § 44-12-77 (1982).

The district court rejected Park 'N Go's argument that its parking facility was not sufficiently similar to an enclosed garage for the statutory presumption of a bailment relationship created by section 44-12-17 to apply. Instead, the court noted that nothing in the language of the statute indicated that a distinction should be made between parking structures and parking lots and that the cases decided under the statute did not distinguish between parking

facilities that are buildings and those which are enclosed lots. *See generally, Goodyear Clearwater Mills v. Wheeler,* 77 Ga.App. 570, 49 S.E.2d 184 (1948). The district court therefore, concluded that Park 'N Go was a bailee and again concluded that the vehicles parked in the lot were in Park 'N Go's care, custody, or control.

Park 'N Go argues that section 44-12-17 applies only to "garages" and is inapplicable to a parking facility where a patron self-parks in an open setting. Park 'N Go also asserts that it made no representation about the standard of care it would provide for the vehicles parked in its lot, that it provided no security system or personnel, and that it had no control over the vehicles because the vehicles were locked, and the keys were in the custody and control of the owners. Park 'N Go contends that, because the law of Georgia is unsettled on this issue, the question should be certified to the Georgia Supreme Court for resolution.

USF & G responds that nothing is ambiguous in the exclusion for property in the "care, custody or control" of the insured and that the phrase must be given the plain and ordinary meaning of the terms used. USF & G contends that Park 'N Go exercised care, custody, or control over the vehicles parked in its facility by limiting access to them with a six to seven feet high fence that enclosed the facility and by requiring that those who attempted to leave the facility present a ticket and pay a parking fee or fill out a lost ticket form and provide further identification and proof of ownership of the vehicle.

While it may possibly be true that the phrase "care, custody or control" itself presents no ambiguity in definition, whether the

relationship between Park 'N Go and its patrons falls within that definition—which might be, as the district court noted, synonymous with the concept of bailment as it has been developed in the Georgia state courts—does appear not to have been settled by presently existing Georgia law. The state law on the issue of bailment involved in this case is unclear. We agree that it would be best for the Supreme Court of Georgia to first address the questions of whether or not a bailment relationship existed and to what extent, if any, the law of bailment determines whether the $250,000 limit applies.

*B. Whether the Disclaimer is Valid:*

Again arguing that it was no bailee and that the pertinent vehicles were not in its care, custody, or control, Park 'N Go says that, even if section 44-12-77 does apply to open lots, Park 'N Go preempted any presumption of bailment created in section 44-12-77 by including a disclaimer on the back of the ticket to park given to each customer.[1]

The district court rejected this disclaimer argument, writing that, "although the Georgia cases are not in agreement as to whether such disclaimers are valid, the trend is to uphold the disclaimer only when there is evidence that the bailor was aware of it." The district court found that no evidence existed that the disclaimer on the back of the parking ticket was brought to the attention of the patrons, either upon entering or leaving the

---

[1]The disclaimer on the back of the ticket sets out these words: "This ticket must be presented to the cashier on leaving the parking area. Charges are for use of parking space only. This company assumes no responsibility for loss through fire, theft, collision or otherwise to the car or contents."

parking facility.  The district court concluded, therefore, that "the mere existence of a printed disclaimer on the parking ticket does not rebut the statutory presumption of a bailment relationship between [Park 'N Go] and its patrons."

Georgia law is also unclear on this issue, and we leave for consideration by the Supreme Court of Georgia the questions of whether the disclaimer was valid to remove from Park 'N Go's "care, custody or control" vehicles that otherwise might be considered to have been within Park 'N Go's "care, custody or control."

*C. Contractual Interpretation and Intention of the Parties:*

Park 'N Go argues that, even if the vehicles parked in the lot were in Park 'N Go's "care, custody or control" as the terms are understood in their ordinary usage or because a bailment relationship existed and defines the phrase, the "care, custody or control" exclusion does not apply.  Park 'N Go says that, despite the plain language of the contract, application of the plain language would achieve a result contrary to the intention of the parties in entering into the insurance contract.  Park 'N Go contends that, because all of its business (of which USF & G was aware) consisted of operating the airport parking facility, exclusion from liability coverage of all vehicles in Park 'N Go's care, custody, or control would nullify the liability coverage (for which Park 'N Go paid) on all vehicles parked in its lot and render meaningless the liability provisions of the policy.

In Georgia, insurance policies are governed by ordinary rules of contract construction.  *Chicago Title Ins. Co. v. Citizens & S. Natl. Bank,* 821 F.Supp. 1492, 1494 (N.D.Ga.1993).  The rules of

contract interpretation are statutory, and construction of a contract is a question of law for the court. *See* O.C.G.A. §§ 13-2-1 through 13-2-4. Georgia law places much importance upon the intent of the parties in entering into a contract. Section 13-2-3 of the Georgia Code provides:

> The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical and arbitrary rules of construction.

O.C.G.A. § 13-2-3.[2] The district court noted that resolution of an insurance contract dispute ultimately concerns the intention of the parties; but the district court, in fact, did not expressly

---

[2]Section 13-2-2 sets forth nine general rules for contract interpretation. The district court cited two rules in its analysis of the meaning of the terms "care, custody or control:"

> The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.

and

> If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally preferred.

We note two others that may be relevant in this case:

> Words generally bear their usual and common significance; but technical words, words or art, or words used in a particular trade or business will be construed, generally, to be used in reference to this particular meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties.

> The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied.

consider the intentions of the parties when they entered into the insurance agreement.[3]

Some Georgia courts have held that, to determine the intention of the parties, the court shall take all of the terms of the contract together and consider them *in the light of surrounding circumstances.  See Paul v. Paul,* 235 Ga. 382, 219 S.E.2d 736 (1975).  In *Paul,* the court explained:  "That construction [is] favored which gives meaning and effect to all of the terms of the contract over that which nullifies and renders meaningless a part of the language therein contained."  *Id.* 219 S.E.2d at 739.  Where the intention of the parties at the time of executing the agreement is clear, it should be enforced, even though the parties disagree about its meaning at the time of litigation.  *Id.* 219 S.E.2d at 738.  Still, other courts have held that, "where the terms of a written contract are clear and unambiguous, the court will *look to the contract alone* to find the intention of the parties."  *See Health Service Centers, Inc. v. Boddy,* 257 Ga. 378, 359 S.E.2d 659, 661 (1987).[4]

---

[3]The district court seemingly considered the parties' intent only as it related to the relevancy of the disclaimer on the back of the parking ticket.  The district court concluded:

> Unless the parties here had an understanding concerning the legal effect of the wording of parking tickets given to defendant's patrons—matters for which no evidence has been presented to the Court—it seems somewhat strained to conclude that this case, between an insurance carrier and its insured over construction of a contractual term, turns on such fine, and sometimes inconsistent, legal distinctions as have been made in the context of litigation between bailors and bailees.

[4]These cases are not necessarily inconsistent, but we leave that issue for resolution by the Georgia courts.

The Supreme Court of Georgia recently has held that the court must look to " "the substantial purpose which must be supposed to have influenced the minds of the parties, rather than at the details of making such purpose effectual.' " *Friedman v. Friedman*, 259 Ga. 530, 384 S.E.2d 641, 643 (1989) (citing *Illges v. Dexter*, 77 Ga. 36, 39-49 (1886)). In *USF & G v. Gillis*, 164 Ga.App. 278, 296 S.E.2d 253 (1982), for example, Georgia's intermediate appellate court held that it was logically inconsistent to argue that the parties intended that an exclusion would govern and that, as a result, no liability insurance coverage existed on a truck involved in an accident where "[a]pplied literally, the exclusion provision would preclude coverage of the truck under any and all circumstances," although the truck was the only covered auto listed on the policy. *Id.* 296 S.E.2d at 256. In a similar way, the Fifth Circuit has held that under a business liability policy, " "the parties are assumed to have in contemplation the nature and character of the business and to have foreseen the usual course and manner of conducting it.' " *Travelers Indemnity Company v. Nix*, 644 F.2d 1130 (5th Cir.1981) (citations omitted) (applying Louisiana law).

In cases of doubt, all here agree that the contract shall be construed most strongly against the party who prepared it. *Paul*, 219 S.E.2d at 739 (citations omitted). In addition, exceptions, limitations, and exclusions to insurance agreements require "a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad premises assumes a duty to define any limitations on that coverage in clear and

explicit terms." *See Alley v. Great American Ins. Co.,* 160 Ga.App. 597, 287 S.E.2d 613 (1981). Any exclusion sought to be invoked by the insurer is to be liberally construed against the insurer unless it is clear and unequivocal. *See First Georgia Ins. Co., v. Goodrum,* 187 Ga.App. 314, 370 S.E.2d 162, 163 (1988). Where the intentions of the parties differ, Georgia law requires that "the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." O.C.G.A. § 13-2-4.

So, Park 'N Go argues that to determine the parties' intent, the court must consider the relationship of the parties, the type and purpose of the contract involved, and which party drafted the contract, instead of merely concentrating on the terms of a particular provision. Park 'N Go contends that it fully and accurately described to USF & G its business before entering into the insurance contract and that USF & G's agent personally saw the business enterprise and advised Park 'N Go about what kinds and what amounts of coverage Park 'N Go needed to protect its business enterprise fully. Park 'N Go claims that it relied on USF & G's advice and purchased broad liability coverage for the sole purpose of protecting its business, which is entirely the operation of a parking facility.

Park 'N Go points out that the policy designated as covered under the $1 million Garage Liability Coverage "any auto," which Park 'N Go assumed included any vehicles parked in its lot. Having expressed this broad coverage, Park 'N Go claims that USF & G did not define the limitations in clear and explicit terms and that the

exclusion should be narrowly construed. Park 'N Go argues that to hold otherwise renders the liability provisions meaningless and means that the very coverage Park 'N Go sought (and everyone knew was most needed) is not provided by the pertinent policy. In reply, USF & G contends that the words of the contract are clear and unambiguous and that the court need consider only the terms of the contract to find the parties' intent.[5]

Case law in Georgia tends to support Park 'N Go's position that the intention of the parties—determined by giving due consideration to the nature of the insured's business and to the purpose for which the insurance is obtained—is paramount to the actual language of the contract that attempts to effectuate that intention. But other case law in Georgia tends to support USF & G's position that, where the terms of the contract are clear and unambiguous, the court need consider only the contract to find the intention of the parties.[6] Although USF & G correctly observes that Park "N Go does receive some insurance coverage even under the exclusion, the issue would not seem to turn upon whether Park 'N Go receives some insurance or none at all, but upon whether the parties intended that Park 'N Go's more comprehensive liability insurance would be limited in those circumstances. Because Georgia state law on the issue of contract interpretation involved in this case is unsettled, we certify to the Supreme Court of Georgia the

---

[5]USF & G, it appears, offers no other evidence of its intent in entering into the contract.

[6]Park 'N Go argues that the exclusion is unclear and ambiguous while USF & G maintains that the terms are clear and unambiguous. We make no determination about whether the terms or the contract itself is clear and unambiguous.

question of whether the "care, custody or control" exclusion in the Garage Keepers Coverage portion of the insurance contract applies and limits Park 'N Go's insurance coverage to $250,000.00.

## QUESTION TO BE CERTIFIED

Does the "care, custody or control" exclusion in the Garage Keepers Coverage portion of the insurance contract apply and limit Park 'N Go's insurance coverage to $250,000.00?

In the course of deciding this question, the Georgia Supreme Court may choose to discuss these questions:

A. Are the terms "care, custody or control" defined by the law of bailment?

B. Does section 44-12-17 apply to the kind of parking facility Park 'N Go operated and create a statutory presumption of a bailment relationship?

C. Is the disclaimer on the back of Park 'N Go's ticket valid, and if so, what legal effect does it have in interpretation of the insurance agreement between Park 'N Go and USF & G?

D. Does the exclusion apply where its application, given the nature of the insured's business, seems to render meaningless the liability provisions in the contract?

Nothing in this certification, including our statement of the question to be certified, is meant to limit the scope of inquiry by the Supreme Court of Georgia. *See Polston,* 952 F.2d at 1310-11. The entire record in the case, together with copies of the briefs of the parties, is transmitted herewith.

QUESTION CERTIFIED.