[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14228

_____

D. C. Docket No. 2:12-cv-00225-RWS

ST. PAUL MERCURY INSURANCE COMPANY,

Plaintiff-Appellee,

versus

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for Community
Bank & Trust of Cornelia, Georgia,
CHARLES M. MILLER; TRENT D. FRICKS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(December 17, 2014)

Before WILSON and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*]
District Judge.

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District
of Florida, sitting by designation.

SCHLESINGER, District Judge:

This appeal arises from a declaratory judgment action initiated by St. Paul Mercury Insurance Company, a subsidiary of The Travelers Companies, Inc. ("St. Paul"). St. Paul filed this action in response to a separate federal lawsuit brought by the Federal Deposit Insurance Corporation ("FDIC"), as receiver ("FDIC-R") for Community Bank & Trust ("Bank"), against Charles M. Miller and Trent D. Fricks, former Bank officers ("Officer defendants"). In that separate action, the FDIC-R sought recovery from the Officer defendants' for alleged gross negligence and breaches of fiduciary duty related to the Bank's Home Funding Loan Program ("FDIC-R action"). St. Paul disputes coverage for the separate FDIC-R action, and brought this lawsuit seeking a determination of coverage and its duty to advance defense costs to the Officer defendants in the separate FDIC-R action.

## I.

On January 29, 2010, the Georgia Department of Banking and Finance closed the Bank and appointed the FDIC as receiver. Upon appointment, the FDIC-R assumed the obligation to determine and pay creditors' claims from receivership assets. The FDIC in its corporate capacity became one of the receivership's primary creditors—after paying insured deposits from its Deposit Insurance Fund, the FDIC acquires a subrogated claim for those deposits. As part of its effort to secure assets to pay creditors, including the FDIC's Deposit

2

Insurance Fund, the FDIC-R brought its action against the Officer defendants. In that action, the FDIC-R alleged that the Officer defendants' tortious conduct caused over $15 million in damages by, in the case of Fricks, approving loans in violation of the Bank's loan policy and prudent lending practices, and, in the case of Miller, failing to adequately supervise Fricks and implement corrective measures.

The Policy, drafted by St. Paul, provided liability coverage to Directors and Officers of the Bank for:

> Loss for which the Insured Persons are not indemnified by the Company and which the Insured Persons become legally obligated to pay on account of any Claim first made against them, individually or otherwise . . . for a Management Practices Act.

The Policy contains five separate insuring agreements applicable to: (1) management liability; (2) employment practices liability; (3) fiduciary liability; (4) trust liability; and (5) bankers professional liability, including lender liability and professional services liability.

FDIC-R seeks coverage under the management liability insuring agreement, particularly the "Directors and Officers Individual Coverage" ("Officer Coverage"). The Officer Coverage provides, in relevant part: "The Insurer shall pay on behalf of the Insured Persons Loss for which the Insured Persons . . . become legally obligated to pay on account of any Claim first made against them .

. . for a Management Practices Act . . . ."

The Policy's definition of a "Claim" includes a "civil proceeding against any Insured."  A "Claim" also includes a "formal administrative or regulatory proceeding . . . commenced by . . . a notice of filed charges, a formal investigative order or a similar legal document."

The Policy defines "Insured" to include "Insured Persons," which encompasses "Directors or Officers."  A "Director or Officer" is defined as "any natural person who was, now is or shall be a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company . . . ."  "Company" is defined to include Community Bankshares, Inc., and its subsidiaries, including CB&T.

The Policy also contains an "insured-versus-insured" exclusion, applicable to all insuring agreements, including the Officer Coverage.  This exclusion provides:

> The Insurer shall not be liable for Loss [including Defense Costs] on account of any Claim made against any Insured:
>
> * * *
>
> 4.    brought or maintained by or on behalf of any Insured or Company [including CB&T] in any capacity, except:
>
>     (a)    a Claim that is a derivative action brought or maintained on behalf of the Company by one or more persons who are not Directors or Officers and who bring and maintain

4

such Claim without the solicitation, assistance or active participation of any Director or Officer;

(b)    a Claim brought or maintained by a natural person who was a Director or Officer, but who has not served as a Director or Officer for at least six-years preceding the date the Claim is first made, and who brings and maintains the Claim without the solicitation, assistance or active participation of any Director or Officer who is serving as a Director or Officer or was serving as a Director or Officer within such six-year period;

(c)    a Claim brought or maintained by or on behalf of any Insured Person for an Employment Practices Act;

(d)    a Claim brought or maintained by any Insured Person for contribution or indemnity, if the Claim results from another Claim covered under this Policy;

(e)    only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, a Claim brought or maintained by or on behalf of any Employee of the Company for any Fiduciary Act;

(f)    a Claim brought by an Insured Person solely in his or her capacity as a customer of the Company for a Trust Act or a Professional Services Act, provided that such Claim is instigated totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any other Insured; or

(g)    a Claim brought or maintained in a jurisdiction outside of the United States of America, Canada or Australia by an Insured Person of a Company incorporated or chartered in a jurisdiction outside of the United States of America, Canada or Australia.

Finally, the Policy's Officer coverage extends only to a "Loss" as defined in

the Policy.  The Policy defines "Loss" in pertinent part as:  "[T]he amount which the Insureds become legally obligated to pay on account of each Claim . . . for Wrongful Acts for which coverage applies, including Damages, judgments, settlements and Defense Costs . . . ."

The Policy then carves out certain items from the definition of covered Loss. Of importance here, this includes the unrepaid loan carve-out in subsection (c) of the definition of Loss, which provides that an "amount" that constitutes "any unrepaid, unrecoverable or outstanding loan, lease or extension of credit to any Affiliated Person or Borrower" is not included as a covered Loss.

The definition of "Affiliated Person" used in the unrepaid loan carve-out expressly includes any "Director, Officer or Employee" of the Bank.  On the other hand, the term "Borrower" used in the carve-out is defined to mean "any individual or entity that is not an Affiliated Person and to which the Company extends, agrees to extend, or refuses to extend, a loan, lease or extension of credit."

II.

On September 21, 2012, St. Paul filed suit in the United States District Court for the Northern District of Georgia seeking a declaration that the Policy bars coverage for the FDIC-R action.  On December 26, 2012, St. Paul requested summary judgment.  Following additional briefing on whether the applicable Policy provisions were ambiguous, the district court determined:  that the unrepaid

6

loan carve-out provision was ambiguous in this context; that the insured v. insured exclusion was "not ambiguous, that any ambiguity in the policy c[ould] be resolved without resort to parol evidence;" that no further discovery was necessary; and that St. Paul "ha[d] no duty under the policy to pay to defend or to indemnify" the Officer defendants.

## III.

This Court reviews *de novo* the district court's decision to grant summary judgment. *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.*, 635 F.3d 1190, 1194 (11th Cir. 2011). A court may grant a motion for summary judgment only where the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Beach Cmty. Bank*, 635 F.3d at 1194.

## IV.

This case presents us with the following issues. First, whether claims brought by the FDIC-R as receiver for a closed bank against former directors and officers of the bank are covered under the Policy that excludes from coverage actions brought "by or on behalf of" any "Insured" or the "Company." Second, whether the district court erred in concluding that the Policy unambiguously precluded coverage and refusing to consider extrinsic evidence or allow further discovery. Third, and finally, whether the unrepaid loan carve-out provision

7

precludes coverage for damages that are unrepaid loans.

## A.

The FDIC-R maintains that the plain language of the insured v. insured exclusion precludes coverage only for actions brought "by or on behalf of any Insured or Company in any capacity." Neither the exclusion nor the defined terms make any reference to the FDIC, regulators, or any liquidating entity; therefore, the FDIC-R insists the district court erred in concluding the insured v. insured exclusion applied. Not surprisingly, St. Paul disagrees and insists the district court correctly interpreted the insured v. insured exclusion.

The disagreement between the parties has its genesis in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994). In *O'Melveny*, the Supreme Court considered a suit where the FDIC brought an action against a law firm for "professional negligence and breach of fiduciary duty." *Id.* at 82. The FDIC argued that despite the cause of action originating under California law, federal law governed the rights of the FDIC because it was an appointed receiver of a failed financial institution under a federal statute. *Id.* at 83. The Supreme Court granted certiorari to examine two issues: (1) whether federal common law, not state law, "determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation;" and (2) even if state law answers the first question, whether "federal common law determines the more narrow question whether

knowledge by officers so acting will be imputed to the FDIC when it sues as receiver of the corporation." *Id.*

The *O'Melveny* Court disposed with the first issue by explaining that "'[t]here is not federal general common law,'" *id.* (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)), and that state law, not federal, "govern[ed] the imputation of knowledge to corporate victims of alleged negligence . . . ." *Id.* at 84–85. For the second, more complex issue the FDIC maintained that even though the claim arose under state law, federal law governs the FDIC's rights because it was appointed as a receiver of the failed savings and loan pursuant to a federal statute—the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101–73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C.). *Id.* at 85. The Court was not persuaded by this argument and instead explained that where Congress promulgated a "comprehensive and detailed" statute, the court must presume that matters unaddressed in the federal statute are "left subject to the disposition provided by state law." *Id.*

In reaching this conclusion, the *O'Melveny* Court stated,

> Section 1821(d)(2)(A)(i), which is part of a title captioned "Powers and duties of [the FDIC] as . . . receiver," states that "the [FDIC] shall, . . . by operation of law, succeed to—all rights, titles, powers, and privileges of the insured depository institution . . . . " 12 U.S.C. § 1821(d)(2)(A)(i) (1988 ed., Supp. IV). *This language appears to indicate that the FDIC as receiver "steps into the shoes" of the failed S & L, obtaining the rights "of the insured depository institution" that*

9

*existed prior to receivership.* Thereafter, in litigation by the FDIC asserting the claims of the S & L—in this case California tort claims potentially defeasible by a showing that the S & L's officers had knowledge—any defense good against the original party is good against the receiver.

*Id.* at 86 (emphasis added) (internal quotation marks and citations removed).

The parties disagree on the import of the stepping into the shoes language. According to the FDIC-R, *O'Melveny* does not stand for the proposition that the FDIC-R's role as successor to the failed Bank renders it equivalent to the Bank for all purposes.  It is FDIC-R's position that although the Supreme Court determined that state law applied, because the FDIC "steps into the shoes" of a failed bank, the legal significance of this statement is limited because as the Bank's receiver, FDIC-R steps into a number of pairs of different shoes—as it were the wingtips of the Bank, the pumps of any stockholder, the loafers of any accountholder, and the tennis shoes of any Bank depositor—because the FDIC sues to recoup not only its own losses, but also the losses of depositors and other creditors.  In light of this unique role, FDIC-R asserts a majority of courts have concluded that it is not the equivalent of the insured bank for purposes of insured v. insured exclusions.  *See, e.g.*, *Am. Cas. Co. v. Sentry Fed. Sav. Bank*, 867 F. Supp. 50, 59 (D. Mass. 1994); *Am. Cas. Co. v. FDIC*, 791 F. Supp. 276, 277–78 (W.D. Okla. 1992); *FDIC v. Am. Cas. Co. of Reading, Pa.*, 814 F. Supp. 1021, 1026–27 (D. Wyo. 1991).

By contrast, St. Paul interprets the *O'Melveny* language to mean that when

10

the FDIC, as receiver, asserts state law claims that originally belonged to a failed bank, the FDIC "steps into the shoes" of the bank and is subject to all defenses that could have been asserted against the bank.  That construction, according to St. Paul, captures precisely the circumstances of this case.  St. Paul, in support, points to courts that have recognized that, in asserting the failed bank's claims, the FDIC, or other government entity, stands in the shoes of the bank and therefore the claims were, in effect, brought "by" the insured bank. *See, e.g.*, *Gary v. Am. Cas. Co. of Reading, Pa.*, 753 F. Supp. 1547, 1554–56 (W.D. Okla. 1990); *Mt. Hawley Ins. Co. v. Fed. Sav. & Loan Corp.*, 695 F. Supp. 469, 481–82 (C.D. Cal. 1987).

We need not resolve the disagreement between the parties concerning whether *O'Melveny*'s "steps into the shoes" language may be construed to render the insured v. insured exclusion applicable here if the Policy was ambiguous, regardless of its intended meaning.

## B.

The FDIC-R urges that under Georgia law an insurance policy provision is ambiguous when it is susceptible to two or more reasonable interpretations.  In such circumstances, the FDIC-R argues that the Georgia rules of contract construction provide that the court must adopt the interpretation that favors coverage—regardless of whether that may be the logical choice.  The FDIC-R's position, in other words, is that the language of the insured v. insured exclusion is,

11

at the very least, reasonably susceptible to an interpretation that would provide coverage for the FDIC-R action. St. Paul, on the other hand, maintains the district court correctly determined that no ambiguity existed and that coverage was excluded.

The district court addressed this argument and concluded that not applying the insured v. insured exclusion would have the effect of reading the phrase, "on behalf of," out of the Policy in contravention of the rule that requires this Court to construe a contract "in whole and in every part." O.C.G.A. § 13-2-2(4). It was the district court's opinion that, aside from a derivative action, the only party that could bring an action on a federally insured bank's behalf is the FDIC—demonstrating that the exclusion speaks specifically to this circumstance.

Because the parties do not dispute that Georgia law governs the construction of the Policy, it is necessary to allow Georgia law to guide our inquiry. Previously, we succinctly outlined Georgia's rules of construction for insurance policies:

> Georgia law directs courts interpreting insurance policies to ascertain the intention of the parties by examining the contract as a whole. A court must first consider the ordinary and legal meaning of the words employed in the insurance contract. An insurance policy should be read as a layman would read it. Parties to the contract of insurance are bound by its plain and unambiguous terms. If the terms of the contract are plain and unambiguous, the contract must be enforced as written.
>
> An ambiguity exists, however, when the plain words of a contract are fairly susceptible of more than one meaning. Georgia law teaches that

12

an ambiguity is duplicity, indistinctness, an uncertainty of meaning or expression.  When a term in a contract is ambiguous, Georgia courts apply the rules of contract construction to resolve the ambiguity.

Pursuant to Georgia's rules of contract construction, the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.  Further, ambiguities are construed against the drafter of the contract (i.e., the insurer), and in favor of the insured . . . .  If the ambiguity remains after the court applies the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by the finder of fact.

*Duckworth v. Allianz Life Ins. Co. of N. Am.*, 706 F.3d 1338, 1342 (11th Cir. 2013) (citing *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 773–74 (11th Cir. 2011) (internal citations, alterations, and quotation marks omitted)).

"[E]xceptions, limitations, and exclusions to insurance agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad premises assumes a duty to define any limitations on that coverage in clear and explicit terms."  *U.S. Fid. & Guar. Co. v. Park'N Go of Ga., Inc.*, 66 F.3d 273, 278 (11th Cir.1995) (internal quotation marks omitted).  "Any exclusion sought to be invoked by the insurer is to be liberally construed against the insurer unless it is clear and unequivocal."  *Id*.

Further, a court must not interpret a policy to allow an insurer to provide largely illusory coverage.  In other words, "Georgia public policy disfavors insurance provisions that permit the insurer, at the expense of the insured, to avoid

13

the risk for which the insurer has been paid and for which the insured reasonably expects it is covered." *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 696 S.E.2d 326, 330 (Ga. Ct. App. 2010) (internal alterations and quotation marks omitted).

There is a low threshold for establishing ambiguity in an insurance policy. "Ambiguity in an insurance contract is duplicity, indistinctiveness, uncertainty of meaning of expression, and words or phrases which cause uncertainty of meaning and may be fairly construed in more than one way." *Ga. Farm Bureau Mut. Ins. Co. v. Meyers*, 548 S.E.2d 67, 69 (Ga. Ct. App. 2001). As recognized by Georgia courts, "if a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous . . . ." *Hurst v. Grange Mut. Cas. Co.*, 470 S.E.2d 659, 663 (Ga. 1996) (citing *Lakeshore Marine, Inc. v. Hartford Acc. & Indem. Co.*, 296 S.E.2d 418 (Ga. Ct. App. 1982)).

What is more, "Georgia courts have long acknowledged that insurance policies are prepared and proposed by insurers. Thus, if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured." *Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc.*, 73 F.3d 335, 337 (11th Cir. 1996) (quoting *Claussen v. Aetna Cas. & Sur. Co.*, 380 S.E.2d 686, 687–88 (Ga. 1989)). In other words, "[t]he

14

number of reasonable and logical interpretations makes the clause ambiguous, and the statutory rules of construction require that we construe the ambiguous clause against the insurer." *Hurst*, 470 S.E.2d at 663 (internal citation omitted).  Finally, an important indication of ambiguity in a policy is whether nearly identical or similar language has been construed differently by other courts.  *Boston Ins. Co. v. Gable*, 352 F.2d 368, 370 (5th Cir. 1965) (applying Georgia law).[1]

The FDIC-R asserts a number of arguments in support of its contention that the insured v. insured exclusion is unambiguous and should not apply.  However, it seems to us that the most compelling argument is that courts who have addressed similarly worded insured v. insured exclusions have reached different results.[2]

One such case illustrates the point, *Progressive Casualty Ins. Co. v. FDIC*, 926 F. Supp. 2d 1337 (N.D. Ga. 2013)—a strikingly similar case.  Progressive

---

[1]    In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[2]  St. Paul cites other cases that conclude the insured v. insured exclusion applies, and maintains that these are the "better-reasoned" opinions. *See, e.g.*, *Gary v. Am. Cas. Co. of Reading, Pa.*, 753 F. Supp. 1547, 1554–56 (W.D. Okla. 1990); *Mt. Hawley Ins. Co. v. Fed. Sav. & Loan Corp.*, 695 F. Supp. 469, 481–82 (C.D. Cal. 1987).  Nevertheless, the fact remains that there are two schools of thought on how to interpret insured v. insured exclusions, and that seems to make FDIC-R's point. *Compare St. Paul Mercury Ins. Co. v. Hahn*, No. SACV 13-0424 AG RNBX, 2014 WL 5369400, at *3 (C.D. Cal. Oct. 8, 2014) (holding insured versus insured exclusion is ambiguous as to the FDIC); *W. Holding Co., Inc. v. Chartis Ins. Co.-Puerto Rico*, 904 F. Supp. 2d 169, 182–84 (D.P.R. 2012) (same); *Am. Cas. Co. v. Baker*, 758 F. Supp. 1340 (C.D. Cal. 1991) (same); *and Fid. & Deposit Co. of Md. v. Zandstra*, 756 F. Supp. 429, 433–34 (N.D. Cal. 1990) (same), *with St. Paul Mercury Ins. Co. v. Miller*, 968 F. Supp. 2d 1236, 1243–44 (N.D. Ga. 2013) (holding exclusion applies); *and Fid. & Deposit Co. of Md. v. Conner*, 973 F.2d 1236, 1244–45 (5th Cir. 1992) (same).

Casualty Insurance Company initiated a declaratory judgment action "seeking a declaration that the directors and officers/company liability policy" it had issued did not "afford coverage" to former directors and officers of the bank in a lawsuit filed by the FDIC as a receiver. *Id.* at 1338. Progressive eventually moved for summary judgment claiming, among other things, that coverage was "barred by the 'insured verses insured exclusion' in the policy." *Id.* at 1339. The insured versus insured exclusion specifically provided, "The Insurer shall not be liable to make any payment for Loss in connection with any Claim by, on behalf of, or at the behest of the Company, any affiliate of the Company or any Insured Person in any capacity . . . ." *Id.* at 1339.

Progressive insisted because the policy language excluded any claim "by" or "on behalf of," that this applied to the FDIC-R and barred coverage since the FDIC-R stepped into the shoes of the bank. *Id.* at 1339–40. Interestingly, the *Progressive* Court found ambiguity and concluded,

> However, it is unclear whether the FDIC-R's claims are "by" or "on behalf of" the failed bank. Furthermore, it is unclear what exactly is encompassed by the phrase "steps into the shoes." These ambiguities arise, in part, because the FDIC-R differs from other receivers or conservators that might step into the shoes of a failed or insolvent bank. The FDIC-R is tasked, under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, with bringing claims to recover losses suffered by the federal Deposit Insurance Fund and a bank's depositors, creditors, and shareholders. The FDIC-R has multiple roles. Therefore, the FDIC-R has shown that some ambiguity exists in the insured versus insured exclusion.

16

*Id.* at 1340 (internal citations omitted).

The fact that the district court in this case and the *Progressive* Court reached opposite conclusions about the effect of a nearly identically worded insured v. insured exclusion appears to us to plainly support a finding of ambiguity under Georgia law.  In Georgia, "'[i]f the courts cannot with any degree of assurance, or unanimity, interpret exclusion provisions of this kind, that fact alone weighs heavily against the insurer because the fine print of the policy, where ambiguous, is construed in favor of the assured.'" *First Ga. Ins. Co. v. Goodrum*, 370 S.E.2d 162, 164 (Ga. Ct. App. 1988) (quoting *Travelers Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 175 F. Supp. 673, 676 (E.D. La. 1959)).  Consequently, we conclude that the insured v. insured exclusion is ambiguous.

Since we conclude that the insured v. insured exclusion is ambiguous, it may be necessary to consider extrinsic evidence to determine the parties' intent.  *See Duckworth*, 706 F.3d at 1342 (explaining that if ambiguity remains after the application of the rules of construction, the language of the insurance policy remains ambiguous and the intention of the parties must be consulted to determine what the parties intended).

## C.

Alternatively, St. Paul contends that the unrepaid loan carve-out precludes coverage for damages that are unrepaid loans.  The district court concluded that the

17

definition of loss which carved out unrepaid loans was ambiguous, and we see no reason to disturb that finding.

V.

Based on the foregoing and our review of the record and the parties' briefs, we conclude the insured v. insured exclusion is ambiguous, and that extrinsic evidence may be necessary to determine the parties' intent. Accordingly, this case is remanded to the district court for further consideration in accordance with this opinion.

**REVERSED.**