United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 5, 2007**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 24, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

No. 05-51665

————————————————

BEXAR COUNTY HOSPITAL DISTRICT d/b/a
UNIVERSITY HEALTH SYSTEM

                                   Plaintiff-Appellant,

versus

FACTORY MUTUAL INSURANCE COMPANY,

                                   Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Western District of Texas
--------------------

Before JONES, Chief Judge, WIENER and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge,

     Plaintiff-Appellant Bexar County Hospital District ("University Health System" or "UHS") sued Defendant-Appellee Factory Mutual Insurance Company ("Factory Mutual" or "FM") for breach of contract, alleging that FM improperly calculated the deductible applicable to a claim UHS made on its FM property insurance policy. The district court eventually granted FM's motion for summary judgment, denied a like motion by UHS, and dismissed UHS's action. We affirm.

## I. FACTS & PROCEEDINGS

In May 2003, UHS discovered water in its Electrical Switchgear Room and Central Plant. It determined that its chilled water system was leaking badly. To keep the hospital functioning while it located the source of the leak and made the necessary repairs, UHS rented temporary cooling towers for its air conditioning system. UHS eventually found that a 20-inch bypass line serving one of its cooling towers in the energy plant had developed a substantial leak. Over a period of some 90 days, UHS spent $557,134 to repair the leak and the machinery it had damaged, plus $1,001,093 to rent the temporary water chillers.

At the time the damage occurred, UHS had in place Factory Mutual's Global Advantage policy ("the Policy"), an "all risks" property insurance policy covering both physical damage and "time element" (business interruption) loss. UHS filed separate claims, one for property damage (repairs of leak and machinery), and another for time element loss (rental expense for cooling towers). The Policy required UHS to take all reasonable steps to prevent or minimize time element losses, so the cooling towers rental could not be ascribed to the direct cost of repairing the leaks and the damaged machinery.

FM paid UHS $532,134 for its property damage loss but only $375,600 for its time element loss. The property damage payment covered the full cost of repairing the leak and damaged equipment

2

($557,134), less a $25,000 deductible. The time element payment equaled the full costs to rent the temporary cooling towers ($1,001,093), less a separate deductible for a time element loss resulting from Boiler & Machinery damage, which FM calculated as $625,493, or the value of one day's worth of UHS's total projected operating revenue.

UHS complained to FM that the appropriate "Time Element value" to be used in calculating the particular deductible for that claim should have been the value of its actual time element loss — here the rental costs of the temporary cooling towers, as there had been no business interruption as such, thanks to the rented towers — and not UHS's projected operating revenue. FM stuck to its position, so in March 2004, UHS filed suit in Texas state court for declaratory judgment and breach of contract. FM removed the case to the district court, basing jurisdiction on diversity of citizenship. After filing an Agreed Stipulation of Material Facts, both FM and UHS moved for summary judgment, each arguing that its proffered method for calculating the appropriate time element loss deductible was the only reasonable interpretation of the pertinent provisions of the Policy. The district court granted FM's motion and denied UHS's, and dismissed the case. UHS timely filed a notice of appeal.

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of summary judgment and its interpretation of the insurance policy involved de novo.[1]

**B.    Contract Interpretation**

As this appeal involves a diversity action that turns on contractual interpretation, Texas substantive law governs.[2]   In Texas, insurance policies are subject to the same standards of interpretation and construction as are applicable to contracts generally.[3]   The Texas Supreme Court has specified the methodology for courts to use when interpreting insurance contracts:

> The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.
> If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.[4]

---

[1] Schneider Nat. Transp. v. Ford Motor Co., 280 F.3d 532, 536 (5th Cir. 2002)(citations omitted).

[2] Erie R.R. v. Tompkins, 304 U.S. 64, 82 (1938).

[3] Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998).

[4] Id. (citing Nat'l Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517, 520 (Tex.1995).

4

Accordingly, we must first decide whether the policy at issue is ambiguous.

An ambiguity does not arise merely because the parties advance conflicting contractual interpretations.[5] A contract is ambiguous only when there is a "genuine uncertainty as to which one of two or more meanings is proper."[6] In making that determination, courts must take care not to isolate particular phrases or sentences from their setting, and must consider the contract "as a whole," giving effect to all of its provisions so that none is rendered meaningless.[7] Words used in one sense in one part of the contract should be deemed to have been used in the same sense elsewhere in the contract unless there is a clear indication otherwise.[8] If a court determines that the policy is not ambiguous, it may construe the policy provisions as a matter of law. If, however, the court concludes that the policy is ambiguous on the point at issue, i.e., susceptible to more than one reasonable interpretation, it should

---

[5] Id. at 465 (citing Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex.1997)).

[6] Pioneer Chlor Alkali Co. v. Royal Indem. Co., 879 S.W.2d 920, 929 (Tex. App. 1994)(quoting State Farm Lloyds v. Williams, 791 S.W.2d 542, 545 (Tex. App. 1990)).

[7] Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994).

[8] Gonzalez v. Mission Am. Ins. Co., 795 S.W.2d 734, 736 (Tex. 1990).

adopt the interpretation that favors the insured.[9]  This rule follows from the generally accepted principle that an ambiguous or inconsistent provision of a contract should be construed strictly against the party that drafted it.[10]

**C.    Relevant Policy Provisions**

**1.    Deductibles**

The deductible provisions are found in Section A-11 of the Policy.  The parties agree that the controlling provision is found in the "Boiler and Machinery" exception to the $25,000 default policy deductible.  This exception specifies that the deductible for a time element loss resulting from "Boiler and Machinery" damage will be "1 Day Equivalent Time Element, subject to a minimum of 25,000." The Policy defines "Day Equivalent" as:

> An amount equivalent to the <u>number of days </u>stated times the 100% <u>daily</u> Time Element value that would have been <u>earned</u> following the occurrence at the Location where the physical damage occurred . . . .[11]

The dispute here centers on the meaning of "Time Element value," which determines the calculation of "1 Day Equivalent."

**2.    Value Reporting Provisions**

Section A-9 of the Policy requires that "[t]he Insured will provide the Company 100% values by location."  The "values"

---

[9] <u>Id.</u> at 737.

[10] <u>Id.</u>

[11] Emphasis added.

required to be furnished are (1) property value, (2) stock and supply value, and (3) time element value. The time element values required are those "values anticipated for [the approximate term of the policy, here one year] and the actual Time Element values for the previous 12 month period." Notably, this is the only other place in the Policy in which the disputed phrase, "Time Element value" appears.

When it negotiated the purchase of the Policy, UHS complied with Section A-9 by submitting to FM a "profit and loss statement by location" detailing its operating revenues. UHS contends that (1) it was required to provide these operating revenue reports to facilitate FM's risk assessment function, and (2) risk assessment was the sole purpose of the Value Reporting Provisions. UHS thus denies that it provided any such information "as a basis for computation of a time element deductible" in the event of such a claim. None disputes, however, that UHS's operating revenue data was the only time element information FM ever sought or UHS ever furnished.

## D.  Competing Interpretations

### 1.  Factory Mutual

FM interpreted and computed the Policy's deductible provisions as follows: (1) The time element deductible for loss caused by "Boiler and Machinery" damage is "1 Day Equivalent Time Element"; (2) "Day Equivalent" is defined as:

An amount equivalent to the number of days stated times the 100% daily Time Element value that would have been earned following the occurrence at the Location where the physical damage occurred;

(3) "Time Element value" equals the maximum time element risk covered under the Policy, here UHS's total operating revenue for the term of the policy, i.e., one year; and (4) The total operating revenue "that would have been earned following the occurrence" is UHS's "projected revenue," based on its reported revenue for the three months nearest in time to the date of the damage-causing occurrence.[12]  FM insists that its approach is the only reasonable interpretation of the Policy's deductible provisions, because it is the only reading that is internally consistent and gives meaning to each Policy provision.

### 2.    UHS

Section C-2 of the Policy, "Time Element Coverages," specifies the kinds of time element loss covered under the Policy, viz., (1) gross earnings, (2) extra expenses, (3) leasehold interests, (4) rental insurance, and (5) commissions, profits, and royalties.  UHS contends that, as this section enumerates five different types of time element losses covered, the Policy anticipates the possibility of up to five different types of time element claims.  UHS insists

---

[12] UHS determined that the bypass line leak occurred sometime between March 26, 2003 and May 5, 2003.  FM based its "projected revenue" figures on the revenue reported for April, May, and June 2003.

that the "Time Element value" to be used in calculating the appropriate deductible for a time element claim depends on the type or types of time element loss incurred. Under this reading, "Time Element value" equals the total value of the actual time element loss, and "1 Day Equivalent Time Element" equals the per diem value of the specific type of time element loss incurred, i.e., the total loss divided by the number of days for which that loss continued. In this case, UHS asserts that, because it incurred only an "Extra Expense" loss, its deductible should be only the value of one day's ratable share of its "extra expenses," i.e., $1,001,093 divided by the number of days the cooling towers were rented (91). UHS acknowledges that, as that amount is less than $25,000, the minimum $25,000 deductible would apply.

**E.   Merits**

**1.   Plain Language**

According to FM, "[t]he plain language of the Policy supports a single time element deductible regardless of the type of time element loss sustained." The district court agreed, noting that "nothing in the Policy indicates that a different deductible applies depending upon the type of Time Element loss." FM contends that, by employing the terms "value" and "earned" in its definition of "Day Equivalent," the Policy contemplates a deductible based on

9

revenues or gross earnings and not "Extra Expenses," as UHS argues. The district court, for its part, undertook an analysis of the commonly understood meanings of the terms "value" and "earned" and concluded that "[t]he use of the word 'earned' indicates that the Time Element value refers to operating revenues, not expenses or charges."

UHS attempts to refute the district court's reasoning by identifying definitions of "value" and "earned" that would include "expenses" and "incurred," respectively. UHS also quotes from the Policy itself, which states:

> In determining the liability payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and <u>expenses</u> that would have been <u>earned</u> had no interruption . . . occurred.[13]

In the end, even though we believe that common usage supports FM's and the district court's conclusion on this point, we view UHS's reading as at least plausible. UHS insured not only its potential loss of revenue <u>per</u> <u>se</u>, but also any costs it would incur in providing the services it was required by law to provide to the public should its operation be interrupted. Its "Time Element value," then, could foreseeably include particular "expenses" not necessarily includable as "earnings."

UHS also points to subsection A-11, which states that, "if two or more deductibles provided in this policy apply to a single occurrence, the total to be deducted will not exceed the largest

---

[13] Emphasis added.

10

deductible applicable, unless otherwise provided." UHS contends that this provision clearly indicates that the Policy contemplates separate deductibles for each type of time element loss. For example, if "Boiler and Machinery" damage resulted in gross earnings losses, extra expenses, and lost rental income, FM should calculate separately the "1 Day Equivalent Time Element value" for each loss and apply the largest deductible.[14]

FM responds that the plural, "deductibles," is used in the foregoing provision to address a situation in which multiple peril-specific deductibles could apply to covered losses resulting from a single, multi-peril occurrence. FM reasons that, "[i]t is relatively easy to envision a situation where a single loss could, for example, result from both Flood and Wind," in which case the larger of the Wind or Flood deductibles would apply. FM's argument is bolstered by the fact that the language referencing more than one possible deductible for a single occurrence is found in the Policy's "Deductibles" section, which mentions only peril-specific deductibles and says nothing about multiple time element deductibles. As the district court noted, "the statement cited by UHS does not support its assertion that a different deductible applies to each type of Time Element loss." Nevertheless, nothing in the "Deductibles" section absolutely precludes UHS's interpretation either. Accordingly, we do not hold that our

---

[14] UHS does not challenge FM's application of separate deductibles to its property damage and time element claims.

11

reading of the plain language of the Policy's deductible provisions absolutely forecloses the possibility that "Time Element value" could ever mean "expenses incurred" (or actual loss sustained). Instead, we rest our decision on our construction of the deductible provisions in the context of the Policy as a whole.

## 2. Internal Consistency

FM insists that its interpretation of "Time Element value" is the only possible reading that gives meaning to all of the Policy's provisions and preserves its internal consistency. The only other provision that references "Time Element value" is section A-9, which sets out the Policy's "Value Reporting Provisions." This subsection states that "[t]he Insured will provide the Company 100% values by location," including "Time Element values anticipated for the [approximate term of the policy] and the actual Time Element values for the previous 12 month period."[15] In this case, UHS reported its gross operating revenue, or the total amount of time element loss it would suffer from a total interruption of its operations.

UHS acknowledges that the Value Reporting Provisions relate to the potential risks for coverage and the premiums to be charged for such risks. UHS also concedes that it furnished its operating revenue information to FM "as a basis for [determining FM's] insured risk and policy coverage." UHS denies, however, that its

---

[15] Emphasis added.

reported operating revenue equates to the "Time Element value" specified in the Policy's Value Reporting Provisions. Instead, it asserts that "'time element values' relate to 'time element losses,'" and therefore, "[t]he only reporting required is for anticipated loss." UHS goes on to reason that "if UHS had anticipated loss of any time element coverage . . . then such would have been reported." Essentially, UHS argues that the time element risk assessment purpose of the Policy's Value Reporting Provisions is limited to "anticipated" losses.

FM counters that it would be unreasonable to define "Time Element value" as anything other than the amounts reported in compliance with the Value Reporting Provisions (here, UHS's operating revenue). To do so, it argues, would render those provisions meaningless. For example, under UHS's reading, "Time Element value" means the amount of the actual loss suffered. Time element losses are relatively rare, however, and most, if not all, are unanticipated. It is likely, then, that many potential insureds would report no "Time Element value" at all —— either "anticipated" or "actual" —— thereby partially defeating the risk-assessment purpose of the Policy's Value Reporting Provisions.

We cannot credit UHS's position on this issue as being reasonable. As the Value Reporting Provisions are meant to facilitate FM's risk assessment, it would make no sense for FM to require a potential insured to report only the quantum of anticipated and actual time element losses (here, "Extra

13

Expenses").  We imagine that, were this the case, potential insureds would routinely report nothing, and FM would have nothing on which to base its assessment of the time element risks it assumes under the Policy.  UHS's position is even less defensible in light of the Value Reporting Provisions relating to "property" and "stock and supplies."  There is no doubt that the "values" required to be reported under those provisions provide the basis for the coverage limits and premium rates for the property damage component of the Policy.  It would be at best inconsistent, then, for the time element value reported to play little or no part in FM's assessing the risk of a time element loss; yet under UHS's reading, that would be the result.  A time element value would only be reported if the potential insured had actually suffered a time element loss in the previous year or had reason to anticipate such a loss in the coming year; and even then the values reported would have little or no bearing on the true value of an interruption of the potential insured's operations and thus on its <u>revenues</u>.  We cannot accept such an interpretation of the Policy's language as reasonable; FM's interpretation, however, is reasonable.

### III.  CONCLUSION

As FM's interpretation is the only <u>reasonable</u> interpretation available, the Policy is not ambiguous.  FM's reading of the Policy's deductible provisions (1) comports directly with the plain meaning and common usage of policy terms, (2) preserves the

14

internal consistency of the Policy, and (3) gives meaning to all Policy provisions.  In contrast, UHS's proffered interpretation requires a strained reading of the Policy's plain language, and would render meaningless the time element portion of the Policy's Value Reporting Provisions.  Accordingly, the district court's grant of summary judgment to Factory Mutual and denial of UHS's motion for summary judgment are, in all respects

AFFIRMED.